[L.A. No. 30237. In Bank. June 6, 1974.]

ALVIN LEE DYAS, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Richard S. Buckley, Public Defender, Bernard J. Rosen and Harold E. Shabo, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Joseph P. Busch, District Attorney, Harry B. Sondheim and Daniel L. Bershin, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**MOSK, J.**—Defendant Alvin Lee Dyas, petitioner herein, was charged with one count of possession of amphetamine for sale. (Health & Saf. Code, § 11351.) His motion to suppress the evidence on the ground of illegal

search and seizure was denied, and he seeks review by statutory writ of mandate. (Pen. Code, § 1538.5, subd. (i).)

The motion to suppress was heard on the transcript of the preliminary examination. The sole witness testifying to the events in issue was Marvin E. Klepper, a uniformed patrolman of the Housing Authority of the City of Los Angeles. At 9:30 p.m. on May 1, 1973, Klepper went with a fellow officer to a public housing project to deliver certain legal papers. As he approached he saw defendant standing on a street corner talking with two other men and holding a wax paper bag in his hand. Defendant put the bag in his pocket. When Klepper emerged from the housing project a few minutes later he saw that defendant was still standing on the street talking with the other men and was again holding the paper bag. Defendant put the bag in his pocket a second time.

From this brief observation Klepper formed the opinion that "possibly some type of narcotics" might be in the bag. On the witness stand he sought to justify his suspicion by the fact that defendant appeared to replace the bag in his pocket each time he saw Klepper, and by his belief that a wax paper bag "is usually what they contain marijuana in, and it is pretty prevalent in the area."

His curiousity aroused, Klepper radioed for a "back-up unit" of the housing authority security force. He went up to defendant and his companion and "told them to step over to the wall and to put their hands on the wall." His purpose in ordering defendant to do so, he testified, was "to pat him down to find out what was in his pocket, if anything." Klepper patted down the left side of defendant's jacket, but when he began on the right side defendant elbowed him away. Klepper drew his revolver, grasped defendant at the waist, and "pushed him back toward the wall." Defendant then reached up and dropped the wax bag over the wall. Klepper left defendant in his partner's custody and recovered the bag, which contained a quantity of amphetamine pills. He placed defendant under arrest, handcuffed him, took him to the patrol car, and called for officers of the Los Angeles Police Department, into whose custody he delivered defendant and the evidence. When asked on cross-examination "Under what authority" he made the arrest, Klepper replied, "As a private citizen."

At the hearing on the motion to suppress the evidence the superior court found that if Klepper and his partner "had been acting as peace officers" their search of defendant would have been "clearly unreasonable." The People construe this to constitute a finding that the search lacked probable

cause, and do not challenge it.[1] The court further ruled, however, that Klepper and his partner "were not acting as peace officers at the time" of the search, and denied relief on that ground.

 The exclusionary rule does not apply to evidence obtained in a search conducted by a person who is truly a private citizen. (See, e.g., *People* v. *Buchanan* (1972) 26 Cal.App.3d 274, 286-287 [103 Cal.Rptr. 66] [apartment house manager]; *People* v. *Houle* (1970) 13 Cal.App.3d 892, 895-896 [91 Cal.Rptr. 874] [bail bondsman]; *People* v. *Baker* (1970) 12 Cal.App.3d 826, 833-834 [96 Cal.Rptr. 760] [bowling alley manager]; *People* v. *Superior Court* (1970) 3 Cal.App.3d 648, 659-660 [83 Cal.Rptr. 732] [landlord]; *People* v. *Cheatham* (1968) 263 Cal.App.2d 458, 461-462 [69 Cal.Rptr. 679] [tenant]; *People* v. *Katzman* (1968) 258 Cal.App.2d 777, 786 [66 Cal.Rptr. 319] [roommate]; *People* v. *Botts* (1967) 250 Cal. App.2d 478, 481-483 [58 Cal.Rptr. 412] [service station attendant]; *People* v. *Potter* (1966) 240 Cal.App.2d 621, 630 [49 Cal.Rptr. 892] [tenant]; *People* v. *Johnson* (1957) 153 Cal.App.2d 870 [315 P.2d 468] [defendant's employer].) The two-fold purpose of the exclusionary rule is to deter law enforcement officers from engaging in unconstitutional searches and seizures by removing their incentive to do so, and to relieve the courts from being compelled to participate in such illegal conduct. (*People* v. *Cahan* (1955) 44 Cal.2d 434, 445, 448-449 [282 P.2d 905, 50 A.L.R.2d 513].) Although the latter purpose might to some extent be served by excluding evidence derived from an unlawful search by a private citizen, the former would not. As the court explained in *Botts* (250 Cal.App.2d at pp. 482-483), "Where an exclusionary rule is directed to the police, we may assume that they will have knowledge of it, that there will result directives from the higher echelons designed to secure compliance and to institute acceptable alternative practices, and that both the discipline of an organized police force and the desire to secure convictions will produce compliance with those directives. But, except in unusual cases, we cannot assume that private citizens will be aware of an exclusionary rule, that they will be under any disciplinary compulsion to obey such a rule, nor that they will not be motivated in their conduct by reasons apart from, or in addition to, a desire to assist in securing a criminal conviction. The result of applying an exclusionary rule to cases such as the one at Bench would be to free a guilty man without any assurance that there would

---

[1]Nor is there any claim, of course, that Klepper had a warrant to arrest or search defendant.

result any counterbalancing restraint of similar conduct in the future." (Accord, *People* v. *Houle* (1970) *supra,* 13 Cal.App.3d 892, 895.)[2]

In several cases the courts have extended the "private citizen" rationale to admit the fruits of a search by a person who, although specially trained and licensed as a security officer or investigator, was acting to protect either his personal interests (see, e.g., *People* v. *Petersen* (1972) 23 Cal. App.3d 883, 893-894 [100 Cal.Rptr. 590] [police trainee; search, for safety reasons, of storage area of apartment complex where he lived]; *People* v. *Wolder* (1970) 4 Cal.App.3d 984, 993-994 [84 Cal.Rptr. 788] [policeman; search, for reasons of parental concern, of suspicious boxes stored by his daughter on her rented premises]), or the interests of a private employer (see, e.g., *People* v. *Mangiefico* (1972) 25 Cal.App.3d 1041, 1047-1048 [102 Cal.Rptr. 449] [fire insurance investigator]; *People* v. *Payne* (1969) 1 Cal.App.3d 361, 365 [81 Cal.Rptr. 635] [store detective]; *People* v. *Randozzo* (1963) 220 Cal.App.2d 768 [same]; cf. *People* v. *Superior Court (Smith)* (1969) 70 Cal.2d 123 [74 Cal.Rptr. 294, 449 P.2d 23] [private detective]; but see *People* v. *Millard* (1971) 15 Cal.App. 3d 759, 761-762 [93 Cal.Rptr. 402] [off-duty policeman employed as store detective; search held governed by Fourth Amendment standards]).

The People rely on the latter decisions to justify the search of defendant by Klepper. But on the record of this case, as in *Stapleton* v. *Superior Court* (1968) 70 Cal.2d 97, 100, footnote 3 [73 Cal.Rptr. 575, 447 P.2d 967], "We are not called upon to decide whether searches by private investigators and private police forces should be held subject per se to the commands of the Fourth Amendment on the ground that one of their basic purposes is the enforcement of the law." ▮▮ Here it appears as a matter of law that the person who conducted the search did so neither as a private citizen nor for a private purpose.

To begin with, it is undisputed that Klepper was acting under color of authority. He testified that "we are uniformed officers and the vehicles are marked. . . . The uniforms are the color of the marshal's uniforms . . . with the standard basket weave and leather belts, badge and tie, and standard police dress." He was armed with a revolver, carried handcuffs, and had a two-way radio in his patrol car. Nor did he hesitate to use these indicia of authority in the manner in which they were intended. As we have seen, he radioed for a "back-up unit," ordered defendant to stand

---

[2]The exclusionary rule will nevertheless be applied if the private citizen acted as an agent of the police or participated in a joint operation with law enforcement authorities who either requested the illegal search or knowingly allowed it to take place without protecting the third party's rights. (See cases collected in *People* v. *McKinnon* (1972) 7 Cal.3d 899, 912 [103 Cal.Rptr. 897, 500 P.2d 1097].) In such circumstances exclusion does serve the deterrent purpose of the rule.

spreadeagled against a wall, conducted a pat-down search of defendant's clothing, drew his gun when defendant resisted, arrested and handcuffed defendant on finding contraband, and held him in custody in the patrol car until assistance arrived. Clearly these are the acts of a law enforcement officer. As the trial court accurately observed to counsel at the preliminary hearing, "This wasn't an ordinary private citizen. I think we both recognize that."

Secondly, Klepper was not acting to protect the interests of a private employer. He testified that "I am a patrolman for the Housing Authority, City of Los Angeles. . . . I am employed by the City of Los Angeles, I am bonded and funded and controlled by the Federal Housing [Authority]." Each of these authorities is an arm of its respective government. ▮ The United States Housing Authority is an entity within the Department of Housing and Urban Development, and hence part of the federal executive branch. (42 U.S.C. § 1403.) The statute specifically declares the authority to be "an agency and instrumentality of the United States." It is represented in litigation by the Attorney General, has free use of the mails "in the same manner as the executive departments of the Government," and is exempt from all federal, state, and local taxation. (42 U.S.C. § 1405.)

No less governmental in origin and purpose is the Los Angeles Housing Authority. That entity is created by statute as "a public body corporate and politic." (Health & Saf. Code, § 34240.) It exercises by law "public and essential governmental functions." (Health & Saf. Code, § 34310.) And we have declared that it serves as an administrative agency of the state for the pursuit of state objectives. (*Housing Authority* v. *City of L.A.* (1952) 38 Cal.2d 853, 861-862 [243 P.2d 515].)

The People assert, however, that the primary purpose of the Los Angeles Housing Authority is not to enforce penal laws but to clear slum areas and provide safe and sanitary dwelling accommodations for persons of low income. (Health & Saf. Code, §§ 34200, 34501.) Reliance is then placed on *People* v. *Wright* (1967) 249 Cal.App.2d 692 [57 Cal.Rptr. 781], in which it was then held that a security guard employed by the Los Angeles County General Hospital was not an official whose interrogation of a criminal suspect must be preceded by an admonition of constitutional rights under *Miranda* v. *Arizona* (1966) 348 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and *People* v. *Dorado* (1965) 62 Cal. 2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. The court reasoned (249 Cal. App.2d at pp. 694-695), "It does not matter that a particular employee's duties may be confined to the protection of persons and property on his

employer's premises or that his employer may be the state, a political subdivision thereof or a local entity. What does matter is whether he is employed by an agency of government, federal, state or local, whose *primary mission* is to enforce the law." (Italics added; fn. omitted.)

■ There is no authority for such a restriction on the exclusionary rule. Merely because the "primary" mission of a governmental agency is not law enforcement does not provide its employees with authority to violate with impunity the privacy of citizens with whom they come in contact. Thus searches by inspectors employed by municipal health or fire departments seeking possible code violations are subject to the Fourth Amendment warrant requirement. (*Camara* v. *Municipal Court* (1967) 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727]; *See* v. *City of Seattle* (1967) 387 U.S. 541 [18 L.Ed.2d 943, 87 S.Ct. 1737].) Searches by county social workers of the homes of welfare recipients for evidence of ineligibility "must be deemed unconstitutional unless the county can show compliance with the standards which govern searches for evidence of crime." (*Parrish* v. *Civil Service Commission* (1967) 66 Cal.2d 260, 267 [57 Cal.Rptr. 623, 425 P.2d 223].) Evidence of contraband found in a warrantless search of private premises by a state agricultural inspector looking for insect pests is illegally obtained and must be suppressed. (*Vidaurri* v. *Superior Court* (1970) 13 Cal.App.3d 550 [91 Cal.Rptr. 704]). The warrantless search of a first-class package by a United States postman violates both the Fourth Amendment and implementing federal statutes and regulations, and evidence of contraband discovered thereby is subject to the exclusionary rule. (*People* v. *Superior Court* (1969) 275 Cal.App.2d 489, 494 [79 Cal.Rptr. 904], and cases cited.)

The controlling question, therefore, is not the "mission" of the governmental agency. Whether the exclusionary rule should be invoked depends instead on whether to do so would deter the particular governmental employee, and others similarly situated, from engaging in illegal searches of private citizens. And that question, in turn, depends on such considerations as the training or experience, responsibilities or duties of the employee in question.

■■ Although the People have the burden of justifying this warrantless search (*Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P. 2d 23]), they introduced no evidence of Klepper's particular duties.[3] Even

---

[3]The People were content, rather, to stand on the fact that a public housing authority patrolman is not included in the several lists of "peace officers" contained in the Penal Code (§§ 830.1-830.11). Such lists are not determinative of the problem at hand. Their purpose is merely to authorize the named persons to exercise the

in the absence of such evidence, however, certain conclusions emerge inescapably from the record as a whole. Health and Safety Code section 34278, subdivision (a), vests the Los Angeles Housing Authority with the power to employ such "officers, agents, and employees as it requires," and to determine "their qualifications, duties, terms of employment and compensation." One of Klepper's duties was evidently to deliver "legal papers" to the housing project, the task which brought him there on the evening of his confrontation with defendant. But other undisputed testimony compels us to believe he was far more than a mere process server. As we have seen, he was fully uniformed, armed, and equipped as a law enforcement officer. Considering his proficiency in searching and arresting defendant, it is apparent he had also been specially trained to act in that capacity. In these circumstances we may fairly infer that another of the duties for which Klepper had been hired by the Los Angeles Housing Authority was to enforce penal statutes and regulations on or about housing authority property, and that he was in the course of discharging that duty when he searched defendant without warrant or probable cause.

Accordingly, despite Klepper's claim that he and his partner acted as private citizens, "The seizure of the evidence during that illegal search must be realistically construed, . . . It was in the performance of their duties as officers and as employees and agents of the state." (*People* v. *Martin* (1964) 225 Cal.App.2d 91, 96 [36 Cal.Rptr. 924].) Such a person is no less responsive to the deterrent effect of the exclusionary rule than an ordinary policeman.[4] As the court observed in the context of *People* v. *Superior Court* (1969) *supra,* 275 Cal.App.2d 489, 497, "The deterrent purpose of the exclusionary rule [citation] is as much needed to discourage unauthorized searches by postal employees as it is applicable to illegal quests for criminal evidence. In either case, the invasion of privacy is exactly the same."

In view of the foregoing analysis and the undisputed finding of the superior court that the search of defendant was unreasonable, we conclude the search violated article I, section 19, of the California Constitution and the Fourth Amendment to the United States Constitution, and the evidence obtained thereby must be suppressed.

---

statutory powers of a peace officer. It does not follow that a person who is not thus listed is not bound by the exclusionary rule. That doctrine is not of legislative origin, and the Legislature has not attempted to circumscribe it in the sections mentioned.

[4]Indeed, here the deputy district attorney informed the court at the preliminary hearing that Klepper "has been educated in the laws of search and seizure." That "education" doubtless included an explanation of the scope and operation of the exclusionary rule.

Let a writ of mandate issue as prayed.

Wright, C. J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

**CLARK, J.**—I dissent. While the exclusionary rule should probably not be abandoned until the Legislature provides an effective alternative, it certainly should not be extended.[1]

The majority extends the rule to public housing security guards on the assumption they will be as responsive to its intended deterrent effect as are policemen. However, "there is no empirical evidence to support the claim that the rule actually deters illegal conduct of law enforcement officials." (*Bivens* v. *Six Unknown Fed. Narcotics Agents* (1971) 403 U.S. 388, 416 [29 L.Ed.2d 619, 638, 91 S.Ct. 1999], Burger, C. J., dissenting and citing Oaks, *Studying the Exclusionary Rule in Search and Seizure* (1970) 37 U.Chi.L.Rev. 665, 667.) Moreover, the factors Chief Justice Burger identifies as undermining deterrence of police misconduct will render the exclusionary rule even less effective as applied to security guards.

The rule penalizes the prosecutor without giving him authority to control the police practices leading to exclusion of evidence. (403 U.S. at pp. 416-417 [29 L.Ed.2d at pp. 638-639].) Inadequate as it is, the informal institutional pressure a prosecutor can exert on local police far exceeds his influence on security guards funded by a federal housing agency.

The educational value of the exclusionary rule is further diminished by the time lag between the challenged search and its final adjudication. (403 U.S. at p. 417 [29 L.Ed.2d at pp. 638-639].) If policemen do not have the time, inclination or training to fully comprehend the nuances of the appellate opinions that so tardily define their standards of conduct (403 U.S. at p. 417 [29 L.Ed.2d at pp. 638-639]), how can government employees not primarily involved in law enforcement be expected to?

---

[1]This appears to be the view of a developing majority of the United States Supreme Court. (See *United States* v. *Calandra* (1974) 414 U.S. 338, 347-352 [38 L. Ed.2d 561, 570-574, 94 S.Ct. 613, 619-622] (grand jury witness may not refuse to answer questions on ground they are based on evidence obtained from unlawful search and seizure); *Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 250-275 [36 L.Ed.2d 854, 876-891, 93 S.Ct. 2041]; Powell, J., concurring (federal collateral review of state prisoner's search and seizure claim should be confined to question of whether he had fair opportunity to raise issue in state courts); *Bivens* v. *Six Unknown Fed. Narcotics Agents* (1971) 403 U.S. 388, 416 [29 L.Ed.2d 619, 638, 91 S.Ct. 1999], Burger, C. J., dissenting (Fourth Amendment does not provide cause of action against federal agents for damages resulting from illegal search and seizure, but Congress should create a remedy against government itself as alternative to exclusionary rule).)

Moreover, even assuming the exclusionary rule has a significant deterrent effect when prosecution is the ultimate goal of investigation, it has no effect at all when police are uninterested in prosecution or are willing to risk that goal to achieve others. (*Terry* v. *Ohio* (1968) 392 U.S. 1, 14 [20 L.Ed.2d 889, 901-902, 88 S.Ct. 1868].) If law enforcement officials are commonly motivated by goals other than successful prosecution,[2] other government employees are even more likely to be motivated by such goals. Thus, even if the evidence is ultimately suppressed, it is expedient for a security guard to arrest suspects and to seize weapons, stolen property, and contraband because a criminal arrested and perhaps incarcerated pending a suppression hearing will be inclined to avoid the security guard's domain in the future, even though remaining a law enforcement problem for the community at large.

The writ should be denied.

McComb, J., concurred.

---

[2]"Informed observers have suggested a variety of goals or motivations other than obtaining convictions that may prompt police arrest and search and seizure. These include arrest or confiscation as a punitive sanction (common in gambling and liquor law violations), arrest for the purpose of controlling prostitutes and transvestites, arrest of an intoxicated person for his own safety, search for the purpose of recovering stolen property, arrest and search and seizure for the purpose of 'keeping the lid on' in a high crime area or of satisfying public outcry for visible enforcement, search for the purpose of removing weapons or contraband such as narcotics from circulation, and search for weapons that might be used against the searching officer. A large proportion of police behavior is traceable to these reasons for arrest and search and seizure and thus is not likely to be responsive to any deterrent effect of the exclusionary rule." (Oaks, *Studying the Exclusionary Rule in Search and Seizure* (1970) 37 U.Chi.L.Rev. 665, 721-722, fns. omitted.)