[Civ. No. 4015. Fifth Dist. July 21, 1978.]

LEWIS G. TUCKER, Petitioner, v.
THE SUPERIOR COURT OF FRESNO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Melvin W. Nitz, Public Defender, and Barbara S. James, Deputy Public Defender, for Petitioner.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Willard F. Jones and Edmund D. McMurray, Deputy Attorneys General, for Real Party in Interest.

OPINION

**FRANSON, J.—**

### STATEMENT OF THE CASE

Petitioner is charged by information with six counts of robbery (Pen. Code, § 211). It is also alleged that petitioner used a firearm during the commission of the offense (Pen. Code, §§ 12022.5 and 1203.06, subd. (a)(1)). Petitioner filed a pretrial motion to suppress evidence pursuant to Penal Code section 1538.5 and requested a hearing de novo. He thereafter filed a supplemental motion to suppress and a motion to dismiss pursuant to Penal Code section 995. The trial court denied petitioner's motions. Petitioner filed this petition for writ of mandate/prohibition, and we stayed further proceedings in the trial court.

### STATEMENT OF THE FACTS

At approximately 4:15 a.m. on January 18, 1978, Fresno Police Officer Julian Perea and his partner, Officer Morales, were on duty and eating breakfast at Sambos Restaurant on East Shaw Avenue in Fresno. Perea noticed petitioner sweeping behind the counter area. Perea recognized petitioner as being the robbery suspect depicted in a photograph he had been shown in a briefing about three days earlier. When shown the photograph Perea had told his sergeant that he had seen the suspect at least six times at the downtown Sambos on Van Ness Avenue.

Perea told Morales what he had just seen and then got up and asked the waitress, Shirley Dolland, if there was a telephone available. Dolland replied in the affirmative and took the officer to a telephone in the employees' locker room. Perea telephoned his dispatcher and requested that the photograph be delivered to him at the restaurant so he could verify the identification. The officer also informed waitress Dolland that petitioner was a robbery suspect.

Officer Perea then went over to petitioner and asked him to step outside. Petitioner complied. Perea explained to petitioner that he was a possible suspect in a couple of robberies, that he would like to talk to him about it, and that he was awaiting a photograph to verify his identification. Petitioner was taken to the police vehicle.

It was cold and foggy outside. Petitioner was wearing only a shirt with rolled up long sleeves, pants, and an apron, and was shivering. Officer Perea was also wearing only a shirt and pants without a coat. Perea then went back inside the restaurant and asked waitress Dolland if petitioner had a jacket. She answered affirmatively, and Perea requested that she get it. Officer Perea testified as follows: "[S]he took me to a little room in the back, which she told me was the employees' room. It had lockers. . . . Well, we got back there, and she pointed to a jacket that was hanging on a coat hanger, and she said she thought that was his jacket. . . . I don't believe she was sure at this point." The officer said that something was mentioned about a locker, and, "[i]mmediately, she just reached over and flipped over a lock. It was about arm level to her, she just opened [the locker] and pulled a coat out."

Waitress Dolland testified to the following: She thought that petitioner's jacket was hanging on the back of a chair in the locker room. When she took Officer Perea to the locker room, she reached for a jacket hanging on the back of a chair; however, the cook, who was standing near the doorway, said that the jacket on the back of the chair was not petitioner's and that petitioner's jacket was in petitioner's locker. Dolland said the cook then opened the locker and handed her the jacket. She reached into the jacket pocket because she was "nosey" and pulled out a bank moneybag. Officer Perea told her to put the bag back. She then gave the jacket to Perea.

Perea testified that when he observed that the jacket was a dark blue ski parka he remembered seeing a similar jacket in the photograph he

had been shown three days earlier. He told Dolland to put the jacket back in the locker. Perea then made another telephone call to his supervisor when he realized the possible significance of the jacket. After making the call, he removed the jacket from the locker and put it on the front seat of his car. Petitioner was sitting in the car at the time. When the photograph arrived, it confirmed Officer Perea's suspicions, and he arrested petitioner.

## DISCUSSION

We can well understand the dismay on the part of the average citizen when he learns that a police officer who may have sought to retrieve a suspect's jacket for the sole purpose of keeping the suspect warm during an early morning detention is guilty of an illegal seizure of the jacket so as to require its suppression in a criminal prosecution. Nevertheless, the decisions of our high courts compel us to so hold. In *Beck* v. *Ohio* (1964) 379 U.S. 89, 97 [13 L.Ed.2d 142, 148, 85 S.Ct. 223], the United States Supreme Court states that good faith on the part of the officer is not enough. "If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, . . ." In *Mozzetti* v. *Superior Court* (1971) 4 Cal.3d 699 [94 Cal.Rptr. 412, 484 P.2d 84], the California Supreme Court ruled that the Fourth Amendment applies whenever the police intrude into an area where the citizen has a reasonable expectation of privacy *even though the police are not searching for evidence of crime.*

Turning to the present case, there is no question that petitioner had a reasonable expectation of privacy in his locker. The manager of the Sambos Restaurant testified that the employees' room area is small and exclusively for employees and that the public does not have access to it. Each employee has his own locker and he may lock his locker. Two-thirds of the lockers have locks on them. Some put their names on the lockers and use them repeatedly. Petitioner had his own personal locker, and although he had no lock on it and no name on it, it was closed on the night of his arrest.

The word "search" implies some " 'exploratory investigation, or an invasion and quest—a looking for or seeking out.' " (*Bielicki* v. *Superior Court* (1962) 57 Cal.2d 602, 605 [21 Cal.Rptr. 552, 371 P.2d 288].) Since Officer Perea was looking for petitioner's jacket and had asked the waitress to find it for him, there was a search within the meaning of the

Fourth Amendment. Since the jacket was taken from petitioner's locker without his consent, there was also a seizure.

■ The fact that Officer Perea may not have been on an evidence gathering mission when he went into the restaurant for the jacket does not take the search outside the Constitution. (*Mozzetti* v. *Superior Court, supra,* 4 Cal.3d 699, 706.) ■ Moreover, even assuming that Perea was merely being solicitous of petitioner's welfare, i.e., wanting to get the jacket to keep petitioner warm, such a humanitarian motive does not remove the officer's conduct from the constitutional proscription. In *People* v. *Smith* (1972) 7 Cal.3d 282, 286 [101 Cal.Rptr. 893, 496 P.2d 1261], it is held that the constitutionally guaranteed right of privacy must prevail in the absence of a showing of an imminent and *substantial* threat to life, health, or property. In *Smith* the Attorney General proffered a similar motive to the one in this case, getting a jacket for a small child. The court gave this argument short shrift. "The People seek to magnify this minor errand into a constitutionally adequate basis for the officer's warrantless entry into the apartment. Manifestly it does not rise to the level of 'necessity' as defined in the decisions." (*Id.,* at p. 287, fn. 3.)

■ The Attorney General argues that the search of petitioner's locker was not conducted by Officer Perea but by either the waitress or the cook acting as a private citizen, thereby rendering the exclusionary rule inapplicable. However, the exclusionary rule applies whenever a citizen is an agent of the police or a participant in a joint operation with police authorities who have requested a search. (*Dyas* v. *Superior Court* (1974) 11 Cal.3d 628, 633, fn. 2 [114 Cal.Rptr. 114, 522 P.2d 674].) Moreover, only minimal official participation is necessary to invoke the Fourth Amendment's protection. (*Stapleton* v. *Superior Court* (1968) 70 Cal.2d 97, 101 [73 Cal.Rptr. 575, 447 P.2d 967].)

For example, in *Raymond* v. *Superior Court* (1971) 19 Cal.App.3d 321 [96 Cal.Rptr. 678], a 12-year-old boy entered his parents' private bedroom and found marijuana in the dresser drawer. He told the police, and at the police officer's request, he again entered his parents' bedroom and seized some marijuana. He turned the marijuana over to the police, who then obtained a search warrant for the parents' home. The court found that although the boy was the immediate actor, he was an agent of the police because of the role of the latter's planning and implementation in the expedition. The court stated: "The crux is not the citizen's eagerness but the policeman's involvement. Certainly the boy's activities were volun-

tary. He responded to his own wishes, however agonized, and not to police pressure. The decisive factor was the extent of official involvement in the total enterprise. [Citation.]" (*Id.,* at pp. 325-326.)

The present case falls within *Raymond's* reasoning. Officer Perea initiated the search by requesting Dolland to get petitioner's jacket. Perea testified that Dolland then opened petitioner's closed locker and pulled out the jacket. Dolland testified that as she was about to pick up a jacket from a chair, the cook said that petitioner's jacket was in his locker and proceeded to open it and get it for her. She then handed it to Officer Perea. Under either witness' version of the facts, the locker was opened pursuant to Officer Perea's request for the jacket. Officer Perea was in uniform and was standing in the locker room when the jacket was taken from the locker. Thus, both the waitress and the cook were responding to police authority; they were neither volunteers nor intermeddlers acting on their own behalf. The police involvement was immediate and direct, distinguishing the present case from those involving private citizens acting upon their own initiative. (See, e.g., *People* v. *Minervini* (1971) 20 Cal.App.3d 832, 839 [98 Cal.Rptr. 107]; *People* v. *Superior Court (Evans)* (1970) 11 Cal.App.3d 887, 891-892 [90 Cal.Rptr. 123].)

It is ordered that a writ of mandate issue, commanding respondent court to grant petitioner's motion to set aside the evidence seized from his locker.

Brown (G. A.), P. J., and Hopper, J., concurred.

The petition of the real party in interest for a hearing by the Supreme Court was denied September 14, 1978.