[Crim. No. 13107. Fourth Dist., Div. One. Oct. 13, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
KAREN LEIGHTON, Defendant and Appellant.

498

**COUNSEL**

Paul Newberry and Jeffrey K. Jayson for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jay M. Bloom and Rudolf Corona, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

STANIFORTH, J.—After an unsuccessful motion to suppress evidence (Pen. Code, § 1538.5), defendant Karen Leighton pleaded guilty to grand theft (Pen. Code, § 487, subd. 1). She was granted probation upon conditions inter alia that she spend nine months in the county jail. She appeals, contending the warrantless search of her bedroom was illegal and her motion to suppress evidence improperly denied.

### FACTS

Leighton worked as an employee of the customer service department of Nordstrom Department Store (Nordstrom) in the South Coast Plaza of the City of Costa Mesa. Between November 1, 1979, and January 20, 1980, Leighton misappropriated approximately $4,252. Leighton handled customer credit accounts, merchandise returns and had access to purchase and refund slips. In the early part of January, she asked her roommate Tammy Fields, also an employee of Nordstrom, to come to the customer service department. On this and several other occasions, Leighton gave her money in an envelope which Fields placed in Leighton's locker. On January 14, 1980, Julie Lidstrom, a Nordstrom employee and friend of Leighton, saw blank refund slips on the desk at Leighton's residence. At about this same time—early January 1980—Millie Ruffalo, a security manager for Nordstrom, became suspicious of Leighton and commenced an investigation of refund slips at the South Coast Plaza store.

On that same day, Leighton was discharged from Nordstrom upon a charge of stealing a bottle of perfume. Leighton explained she took the perfume for her roommate Fields. The security officers questioned Fields and her mother on January 15 concerning Leighton's statement. Fields denied taking a bottle of perfume. Instead she told the investigators Leighton had approached her about cashing some blank refund slips; Leighton was preparing a scheme to take money from the store. Fields filled out a statement setting forth these matters on Costa Mesa police stationery the police had provided the store.

Earlier that same day, security officers met with Lidstrom and after confronting her with stolen refund slips, Lidstrom confessed and implicated Leighton. Lidstrom signed a confession—again on Costa Mesa police stationery. She was placed under arrest by the security officer. On the following day, Fields was in Leighton's bedroom watching tele-

vision when she saw papers on Leighton's desk. She noted the estimated figures on the papers and one of the typewritten documents with words stating "This is how I'm going to swindle money." Fields then found refund slips in a desk drawer. She called Ruffalo, told her of her discovery and read the contents of the typewritten document over the telephone.

Ruffalo went that afternoon to get the Nordstrom property from Leighton's apartment. Fields let Ruffalo and two Nordstrom employees into the apartment. Ruffalo testified that her main purpose in going to Leighton's apartment was to pick up property belonging to Nordstrom and she may have intended to place Leighton under arrest but Leighton was not then present. Fields led the Nordstrom employees into Leighton's bedroom but did not say whose bedroom it was. Fields opened the desk drawer and handed several typewritten documents and refund slips to Ruffalo. The papers were in an accordian envelope. Neither Ruffalo nor the other Nordstrom employees conducted a search of the room itself. These documents were taken back to Nordstrom and then turned over to the Costa Mesa police.

On January 18, 1980, the Costa Mesa police were called in (at Fields' suggestion) and stationed themselves in anticipation of another illegal attempt to obtain cash refunds. The police arrested a friend of Leighton's while in the process of receiving an unauthorized refund. Leighton was arrested and after being advised of her *Miranda* rights waived them and admitted sending other people to Nordstrom with refund slips she had filled out. She admitted tampering with customers' credit accounts. She gave her consent to a search of her apartment and the police then seized certain financial records. At the police station, Leighton made a formal written statement.

DISCUSSION

I

■ Leighton asserts that her roommate, Tamara Fields, and Nordstrom security guard, Millie Ruffalo, acted in concert with the specific objective of assisting law enforcement officials in her prosecution; therefore, she argues the constitutional prohibition against unlawful searches and seizures applies and excludes the evidence seized in her bedroom.

■ The constitutional prohibition against unlawful search and seizure applies only to those searches conducted by law enforcement officials or involving state action or where there is at least a joint operation between the private citizen and the police designed to arrest and obtain evidence against an individual (see *Stapleton* v. *Superior Court* (1968) 70 Cal.2d 97 [73 Cal.Rptr. 575, 447 P.2d 967]) or where the police direct the private citizen to conduct the search (see *People* v. *McKinnon* (1972) 7 Cal.3d 899, 912, 913 [103 Cal.Rptr. 897, 500 P.2d 1097]) or where the private security personnel are engaged in the statutorily authorized citizen's arrest and detention of a person in aid of law enforcement authorities (see *People* v. *Zelinski* (1979) 24 Cal.3d 357 [155 Cal.Rptr. 575, 594 P.2d 1000]). Where the private security guards are not acting in a purely private capacity but rather are fulfilling a public function in bringing violators of the law to justice, then the exclusionary rule has been applied. (See *In re Byran S.* (1980) 110 Cal.App.3d 144, 147, 148 [167 Cal.Rptr. 741]; *People* v. *Superior Court (Harris)* (1979) 100 Cal.App.3d 386, 388 [160 Cal.Rptr. 880].) However, the exclusionary rule continues to be inapplicable to searches and seizures conducted by private parties. (See *Dyas* v. *Superior Court* (1974) 11 Cal.3d 628, 632 [114 Cal.Rptr. 114, 522 P.2d 674]; *People* v. *McKinnon, supra,* at pp. 911-912.)[1]

In *People* v. *North* (1981) 29 Cal.3d 509 [174 Cal.Rptr. 511, 629 P.2d 19], the defendant contended that a police officer tacitly encouraged and approved the victim of a burglary to enter the defendant's car, and therefore, the search of the burglary victim was an improper joint operation between a private citizen and the police. The Supreme Court affirmed this longstanding rule: "'The exclusionary rule will . . . be applied if the private citizen acted as an agent of the police or participated in a joint operation with law enforcement authorities *who either requested the illegal search or knowingly allowed it to take place* [italics in original] *without protecting the third party's rights.*'" (*Id.,* at p. 515; italics added.) The Supreme Court also recited the "alternative tests" described by *Stapleton* and *McKinnon* requiring exclusion of the evidence "when in a joint operation the police either *direct* or *request* the citizen to act or *knowingly stand by* while illegal action occurs." (*Ibid.*) The court points out in *North*: "The mere police consultation with [the

[1]The California Supreme Court has before it the case of *In re Deborah C.*\* (Cal. App.), where the issues include, inter alia, whether the conduct of private security guards constitutes a search and seizure.

\*Reporter's Note: Hearing granted, for Supreme Court opinion see 30 Cal.3d 125 [177 Cal.Rptr. 852, 635 P.2d 446].

burglary victim] did not convert his search into an unconstitutional 'joint operation' thereby invoking the exclusionary rule. The unifying theme of *Stapleton, McKinnon,* and *Dyas,* namely police foreknowledge or simultaneous awareness of a citizen entry, [was] wholly lacking . . . ." (*Id.,* at p. 516.) Therefore, the judgment authorizing the admission of the evidence was affirmed.

We do not have a factual situation parallelling *Zelinski, supra,* where there was a finding that the seizure of the contraband was wholly unrelated to the private interests of the store which the guard was empowered to protect. In *Zelinski,* the security guard was not acting merely in a private capacity but was fulfilling a public function and bringing a law violator to public justice. The guard's action went far beyond the tolerable "vindication of . . . private interests." (24 Cal.3d 357, 366-377.) It is significant that *Zelinski* did not overrule *Dyas* or *Stapleton. People* v. *North,* confirms this conclusion.

The court in *Zelinski* said: "In the instant case, however, we need not, and do not, decide whether the constitutional constraints of article I, section 13, apply to all of the varied activities of private security personnel, for here the store security forces did not act in a purely private capacity but rather were fulfilling a public function in bringing violators of the law to public justice." (*People* v. *Zelinski, supra,* 24 Cal.3d at pp. 366.)

■ Here the evidence shows without contradiction that Leighton's roommate, Fields, totally without prompting or direction by the private security agent, Ruffalo, told Ruffalo of the incriminating documents she had found in Leighton's desk. It is a reasonable inference that Fields' motivation was to protect herself from a charge earlier made by Leighton that Fields was responsible for the theft of perfume. Moreover, Fields had had no previous contact with the police and received no assistance or direction from the private security agents at Nordstrom. Fields acted wholly on her own for her own private interests in protecting herself.

Nor is it apparent that Security Agent Ruffalo acted as a police agent or in cooperation with the police in her investigation of the crime. The sole evidence pointing to any police participation derives from the stationery provided by the police. No other connection with the police officials either by way of cooperation or direction is present. There is no evidence of prior consultation before seizure of the incriminating docu-

ments nor is there any evidence the police had any part in the direction of this investigation.

Thus, in contradiction to the factual matrix of *Zelinski*, Ruffalo's interests were directed towards protecting her clients'—the store's—interests, recovering the records used as a part of a theft scheme and preventing future thieving. She went to the apartment for the specific purpose of recovering her employer's property. If we apply the principles of *Stapleton, McKinnon* and *Dyas* to the facts as found by the trial court, we are compelled to conclude that the trial court correctly refused to exclude the fruits of the search.

Judgment affirmed.

Cologne, Acting P. J., and Malkus, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.