[No. E000029. Fourth Dist., Div. Two. Sept. 5, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
EDUARDO DE JUAN, Defendant and Appellant.

1112

[REDACTED]

## COUNSEL

Bledstein & Lauber and I. Mark Bledstein for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Jay M. Bloom, John W. Carney and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KAUFMAN, Acting P. J.—

### Statement of the Case

Defendant, Eduardo De Juan, was charged by information with two counts of murder (Pen. Code, § 187). As to each count, it was alleged defendant had used a firearm, a handgun, within the meaning of Penal Code section 12022.5. Defendant pled not guilty to the charges and denied the weapons use allegations.

Defendant moved to suppress evidence pursuant to Penal Code section 1538.5. After an extensive hearing lasting several days, the motion was granted in part but denied in larger part. All the evidence not suppressed was introduced at trial.

Defendant was tried by a jury, and found guilty of two counts of first degree murder. The jury found the firearm use allegations to be not true. Defendant was sentenced to state prison for the term prescribed by law on both counts.

Defendant appeals, contending the trial court erred in denying in part his motion to suppress evidence and that the introduction of the challenged evidence constituted prejudicial error.

### Facts Adduced at Trial

Defendant and the DeCastro brothers, Angel and Alberto, were involved in a scheme to sell cocaine. The DeCastros brought the contraband from Miami to the Los Angeles area. Defendant was to arrange for a buyer.

On December 29, 1980, defendant came to the apartment shared by Evaristo Nicado and the DeCastro brothers. Defendant was going to take the DeCastro brothers to meet the prospective cocaine buyer.

Defendant and Alberto DeCastro went in defendant's blue Plymouth Duster to a location at the West Covina mall. They were followed by Angel DeCastro and Evaristo Nicado in a second car. Defendant and the DeCastro brothers left from that point in defendant's blue Duster, ostensibly to meet the cocaine buyer. Nicado remained behind at the mall with the second vehicle. After several hours, defendant came back alone.

Defendant told Nicado he would take him to where the DeCastro brothers were. Defendant drove him to a house near the outskirts of West Covina and told him to go across the street to that house; that Angel and Alberto DeCastro were there. As Nicado went up to the house, another man appeared from a walkway near the house. The man fired four shots at Nicado. The first shot grazed Nicado's right eyelid; the other shots missed. Nicado fell to the ground. He saw his attacker walk over and get into the defendant's car. The car then drove away. The man who shot Nicado looked like defendant's brother Hector De Juan.

About a month later, in late January of 1981, two partially decomposed bodies were found in the desert. The bodies were identified through dental records as those of Angel and Alberto DeCastro. An autopsy showed both DeCastros had been shot. Expert testimony linked the bullets found in the victims' bodies to a gun found in a search by private investigators of a rental car driven by defendant. Nicado also testified he had seen defendant with the gun, and that he saw defendant place the gun in a blue travel bag which was later found in the trunk of the rental car. Other evidence showed defendant had purchased the gun in 1977. Finally, the bullets recovered from the bodies of the victims were unusual in that they had been loaded backwards. This made it impossible to identify the bullets definitely as having been fired from the gun recovered from defendant's rental car. Defendant had boasted to Nicado that this type of reverse-loaded bullet, referred to as a "reverse wadcutter," was impossible to identify by ballistics tests. An acquaintance of defendant and Nicado loaded his own bullets as a hobby. He often made this same type of reverse-loaded bullet, and had in the past furnished bullets to defendant, although he did not specifically remember the type of bullet he had supplied defendant. Some of the bullets found in the blue travel bag when it was later found in the rental car were of the same unusual kind.

### Facts Relating to the Motion to Suppress

The facts adduced at the hearing on defendant's motion to suppress are as follows.

In December 1980 the DeCastro brothers, Angel and Alberto, disappeared. They had last been seen alive on December 29, 1980, in the company of defendant. The person who saw the brothers in the company of defendant when they were last seen was Evaristo Nicado. Nicado shared an apartment with the brothers. The same night the DeCastro brothers disappeared Nicado was shot and wounded by defendant's brother Hector in an apparent attempt to eliminate him as a witness to the events preceding the disappearance of the DeCastro brothers. Nicado, however, refused to pursue the attack on him with the police.

The father of the DeCastro brothers (hereafter the elder DeCastro or Mr. DeCastro) hired a firm of private investigators to search for his two sons. David Gonda, a retired Los Angeles police officer, headed the investigation. James Bowen, another retired police officer turned private investigator, Dan Lambert, and Gonda's daughter Jodi, worked with Gonda on the investigation. They interviewed Nicado, and decided to talk to defendant and his brother Hector, and, if possible, to get them to take polygraph examinations. Lambert was the director of polygraphing for a private investigation firm named Internal Affairs Limited.

On January 13, 1981, Gonda, the elder DeCastro, Nicado and several of the others set up a surveillance of defendant's residence. The plan was to intercept defendant and his brother when they came out of the house and talk to them. However, when the two came out of the house they quickly got into two cars and drove away. Defendant drove a rented Chevrolet Caprice, followed by his brother Hector driving defendant's blue Plymouth Duster.

The private investigators, including Lambert, jumped into two vehicles, a station wagon and a van, and pursued defendant and his brother for about five blocks. Defendant and his brother both moved into the left hand turn lane on Atlantic at its intersection with Slauson in the City of Maywood. The signal was red. Gonda pulled alongside the Plymouth Duster and pulled in front of it. The van driven by one of the other private investigators pulled up behind the Chevrolet Caprice, so that the vehicles being driven by defendant and his brother were blocked.

The investigators approached both defendant and his brother, and asked them to step out of their respective vehicles. Gonda, who testified he approached only defendant's brother, had his gun drawn at the time but reholstered it after the brother got out of the Plymouth Duster. Defendant at first would not get out of the Caprice but eventually did. Each man was patted down for weapons by the investigators, with negative results. De-

fendant was uncooperative in the pat-down and was handcuffed by James Bowen and taken across the street to a bus bench.

Defendant was asked by James Bowen whether he had any weapons in the Caprice. He said he did not. He was then asked by Bowen for permission to search the vehicle. Defendant replied: "Sure, go ahead." A search of the trunk of the vehicle revealed a blue travel bag containing a revolver and some reverse-packed wadcutter bullets. Bowen asked defendant why he had the gun and defendant said he used it for target practice. Defendant's brother was also asked for permission and consented to a search of the Plymouth Duster. The search of the Duster disclosed nothing of consequence.

After the Caprice had been searched and the travel bag, gun and bullets discovered, a local Maywood police officer who had been up the street writing a traffic citation, came to the scene. Gonda identified himself to the police officer as a private investigator and explained what was going on. The Maywood officer left the scene, but came back a few minutes later with his supervising sergeant. The sergeant expressed some reservations about what was going on and, at Gonda's suggestion, telephoned Detective Heieck of the West Covina Police Department. Heieck had handled the West Covina police investigation of the Nicado shooting incident. He had met with Gonda the day before, January 12, 1981, and he knew that Gonda was looking into the disappearance of the DeCastro brothers. He also knew Gonda was looking for defendant. Detective Heieck told the Maywood sergeant not to arrest defendant or his brother but to "have Gonda and his people go ahead and bring [the defendant] out there [to West Covina]" if the defendant was willing. The Maywood sergeant then permitted Gonda and his people to leave with defendant, the revolver and, presumably, the other evidence taken from the Caprice. Defendant believed the investigators were in reality "hit men" from Miami who had been sent to kill him and resisted getting into the Gonda vehicle.

Although denied by the investigators, defendant testified that on the way to the West Covina police station Dan Lambert kept telling him he would have to talk to them. Defendant testified he told Lambert he had nothing to say to him. James Bowen, another of the investigators, told defendant he would have to explain everything now. Defendant responded, "what [are] you talking about?" Defendant testified the investigators left the freeway and took him to a very dark street, where he was pulled from the car. Defendant testified Lambert put a gun to his head and walked him a short distance away from the car. When Lambert kept saying he was going to kill defendant, so that defendant would tell him what happened to the DeCastro brothers, defendant kept saying he did not know what Lambert was talking about, and that he was being framed. After a while, Lambert took defendant

back to the car and, ultimately, defendant was transported to the West Covina police station.

Defendant was still in handcuffs when he was taken into the West Covina police station. Detective Heieck removed the handcuffs from defendant almost as soon as he saw him and informed defendant he was not under arrest. He asked defendant if he had come to the station voluntarily and defendant stated he had. Defendant stated he "wanted to clear the matter up and get to the bottom of things." Detective Heieck and defendant then went into an interrogation room without the others. Within a few minutes, defendant's demeanor became jovial. Detective Heieck advised defendant of his constitutional rights. Defendant waived his rights and agreed to talk to Detective Heieck.

Defendant told Heieck he knew the missing DeCastro brothers; that he met with the DeCastro brothers at the apartment they shared with Nicado; and that he had gone with Nicado and the DeCastro brothers to the West Covina Mall on December 29. He related that he and Alberto DeCastro went in one car, while Nicado and Angel DeCastro went in another. Defendant said that, after walking around the mall for 20 to 30 minutes, he left Nicado with one of the cars, while he took the DeCastro brothers to introduce them to a cocaine buyer. Defendant, while relating this story to Detective Heieck, stated he did not want to discuss narcotics or cocaine, but preferred to talk about "pencils." Defendant told Detective Heieck that Nicado was left with the car which had the pencils in it, and that he took the DeCastro brothers to the other side of the mall to introduce them to some people who would buy the pencils. He did not describe or otherwise identify the people to whom he supposedly introduced the DeCastro brothers. He stated that after he made the introduction, he got in his car and drove home.

When defendant was asked whether he had seen the DeCastro brothers since that time, he stated that was the last time he had seen them. When asked what might have happened to the DeCastros, defendant stated "[s]omething to the effect that if in fact someone were to bring pencils into California from Florida and these pencils weren't paid for, don't you think someone would come over and keep an eye on them? Or if the pencils weren't good quality, don't you think someone might be upset about it?" Defendant told Detective Heieck that the DeCastros were "professionals" and both carried guns.

During the interview Detective Heieck showed defendant the gun that had been recovered from the rented Caprice. Defendant said the gun was not his. He said he had never seen the gun before, that he was an alien and

aliens are not allowed to have guns, and as far as he was concerned the police could keep the gun. However, defendant asked to look at the gun. Defendant then grabbed the gun and handled it in an unusual manner, putting his hands all over the weapon.

Near the end of the interview, upon inquiry by Detective Heieck, defendant agreed to talk to Nicado and Mr. DeCastro. Defendant told Mr. DeCastro he did not know what happened to his sons. Defendant also apparently made scribblings on a hand-drawn map of the United States, to illustrate the route of travel between Florida and Los Angeles.

Defendant moved in the trial court "to suppress any and all tangible and intangible things obtained as a result of an unlawful search and seizure and/or unlawful arrest, including, but not limited to, any observations made by law enforcement, any opinions made or formed as a result of such search and/or unlawful arrest, and any solicited or unsolicited statements allegedly made by the defendant."

The evidence defendant sought to suppress, while not specifically named in the moving papers, may be divided into three categories. First, defendant sought to suppress the physical evidence seized by the private investigators during their search of the vehicle he was driving. This evidence apparently consisted of the blue travel bag and the revolver and bullets that were found in the bag. Second, defendant sought to suppress any evidence of his statements made during the time the private investigators transported him from the scene of his detention to the West Covina police station. Finally, defendant sought to suppress all evidence of his statements and actions at the West Covina police station and the subsequent ballistics tests.

At the conclusion of the hearing on the motion to suppress, the trial court found that in stopping defendant and his brother and making the search and seizure the private investigators were not acting as agents of either the West Covina or Maywood police; that there was no preplanning with the police; and that the search of the Caprice and discovery of the gun, the blue travel bag and the bullets were completed before the Maywood police officers arrived on the scene. The court further found: "The primary purpose of Mr. Gonda was not to aid the West Covina Police Department in their investigation of the shooting of Mr. Nicado. It was to enlist the aid of the West Covina Police Department in his search for Mr. DeCastro as to what happened to his sons. Not to aid and abet the police, but to obtain whatever aid Mr. DeCastro could obtain from the police."

With respect to the question of defendant's consent to the search of the Caprice the court stated: "In reviewing the testimony, the Court is of the

opinion that Mr. De Juan [defendant] did advise Mr. Bowen when asked if he could—or if there was anything in the car, and he responded no, there was not, Mr. Bowen then asked if he could—mind if he searched the car. And the Court believes the testimony of Bowen as corroborated by Lambert, that the defendant did say, sure, go ahead. [¶] But that still doesn't necessarily answer the question of whether or not it was free and voluntary. There were oppressive circumstances existing. The defendant had been taken out of his car at gunpoint. He had been taken over to the sidewalk. And he was in handcuffs, and at least in the process of a citizen's arrest at that point. [¶] As pointed out by the district attorney, even under those circumstances, if it serves the defendant's purposes, he could freely and voluntarily agree to it, even under those circumstances. [¶] The Court has some concern over making a finding that it was totally free and voluntary. I do feel that he did consent to it, but I'm not sure whether it was free and voluntary . . . ."

The trial court further determined that defendant did not get into the Gonda vehicle voluntarily and that in fact he believed Gonda and the others were "hit men" from Miami sent to do him in. The court further stated the Maywood police were derelict in their duties in not taking charge of defendant or insisting that he be released and on that basis ordered suppressed all statements made by defendant during the trip from the place at which defendant had been detained to the West Covina Police Department.

Finally, the trial court found defendant did voluntarily waive his constitutional rights after his arrival at the West Covina police station and that his participation in the discussions at the West Covina Police Department were free and voluntary. Accordingly the court denied the motion to suppress his statements and conduct during those discussions and the subsequent ballistics tests.

### Contentions, Issues and Discussion

Defendant contends the detention and the search of his rented vehicle by the private investigators violated the constitutional proscriptions against unlawful searches and seizures. He urges that all the other evidence (his statements and actions at the West Covina police station as well as the ballistics tests of the gun and the evidence of the bullets found in the blue travel bag and their characteristics) was derived from the illegal stop and detention and should have been suppressed.

The People contend the search and seizure conducted by the private investigators was not subject to the constitutional proscriptions because the investigators were not acting as agents of the government nor were they cloaked with governmental authority or performing a law enforcement func-

tion. Alternatively, they contend the stop was valid as part of a citizen's arrest and the search was incidental to the arrest. They further contend that even if the critical detention was constitutionally impermissible, defendant's consent to the search of the Chevrolet Caprice and his subsequent voluntary waiver of rights and participation in the interview with Detective Heieck coupled with his request to see the gun and his bizarre handling of it sufficiently attenuated any earlier illegality so as to dissipate its taint.

We conclude the trial court properly found the original detention and search were made by the investigators in pursuit of a private, rather than a governmental or law enforcement purpose, so that the search of the Chevrolet Caprice and seizure of the travel bag, the gun and the bullets, while undoubtedly unlawful, were not violative of the constitutional proscriptions against unlawful searches and seizures and, thus, not subject to the exclusionary rule. We further conclude the trial court correctly suppressed all evidence adverse to defendant developed during the ride to the West Covina police station and correctly denied the motion insofar as it sought to suppress evidence of defendant's statements and actions after his arrival at the West Covina Police Department and the subsequent ballistics tests.

1. *The Detention and Search*

■ It is well established that, as a general proposition, the provisions prohibiting unreasonable searches and seizures found in both the federal and California Constitutions and the exclusionary rule based thereon are applicable only to searches and seizures by the government or its agents, not to the actions of private individuals. (*Burdeau* v. *McDowell* (1921) 256 U.S. 465, 475 [65 L.Ed. 1048, 1051, 41 S.Ct. 574, 13 A.L.R. 1159]; *People* v. *McKinnon* (1972) 7 Cal.3d 899 [103 Cal.Rptr. 897, 500 P.2d 1097]; *People* v. *Leighton* (1981) 124 Cal.App.3d 497 [177 Cal.Rptr. 415]; *In re Bryan S.* (1980) 110 Cal.App.3d 144, 147 [167 Cal.Rptr. 741]; *People* v. *Sahagun* (1979) 89 Cal.App.3d 1, 19 [152 Cal.Rptr. 233]; *People* v. *Mangiefico* (1972) 25 Cal.App.3d 1041, 1047 [102 Cal.Rptr. 449]; see also *Dyas* v. *Superior Court* (1974) 11 Cal.3d 628, 632 [114 Cal.Rptr. 114, 522 P.2d 674]; *People* v. *Superior Court (Smith)* (1969) 70 Cal.2d 123, 128-129 [74 Cal.Rptr. 294, 449 P.2d 230]; *Stapleton* v. *Superior Court* (1968) 70 Cal.2d 97, 100 [73 Cal.Rptr. 575, 447 P.2d 967].) When a private citizen makes a search or seizure at the behest or instigation of the police or pursuant to a joint effort with the police, the fruits of the search or seizure will, however, be suppressed. (*Stapleton* v. *Superior Court, supra,* 70 Cal.2d 97, 101-102; see *People* v. *Leighton, supra,* 124 Cal.App.3d at p. 501; *People* v. *Mangiefico, supra,* 25 Cal.App.3d at p. 1047.) Suppression will also be ordered when with knowledge that a private citizen is violating or is about to unlawfully violate the privacy rights of another, the police sit idly by and

do nothing. (See *People* v. *North* (1981) 29 Cal.3d 509, 514-515 [174 Cal.Rptr. 511, 629 P.2d 19]; *Stapleton* v. *Superior Court, supra,* 70 Cal.2d 97, 103.) Finally, the constitutional proscriptions will be applied and suppression will be ordered when the search or seizure was conducted by a member of a private security force in furtherance, not of a private interest but, a public or governmental interest so that, in essence, it constituted performance of a law enforcement function. (*People* v. *Zelinski* (1979) 24 Cal.3d 357, 366-368 [155 Cal.Rptr. 575, 594 P.2d 1000]; see *People* v. *Leighton, supra,* 124 Cal.App.3d 497, 502; *In re Bryan S., supra,* 110 Cal.App.3d 144, 149; *People* v. *Mangiefico, supra,* 25 Cal.App.3d 1041, 1045-1047.)

■ Under the controlling precedents the trial court acted with propriety in declining to suppress the fruits of the private investigators' stop and search of the rented Caprice. The court found on amply sufficient evidence that in stopping defendant and his brother and searching the Caprice the private investigators were not serving a public interest or performing a law enforcement function but, rather, were serving the private interest of Mr. DeCastro in attempting to find out what happened to his sons, the purpose for which they were employed. Although their conduct was outrageous, unquestionably tortious, and no doubt violative of several penal statutes, those are not the questions here. The question we confront is whether the trial court's findings the investigators were serving a private interest rather than a public interest and that they were not performing a law enforcement function (*People* v. *Zelinski, supra,* 24 Cal.3d 357, 366-368; *People* v. *Leighton, supra,* 124 Cal.App.3d 497, 502-503; *In re Bryan S., supra,* 110 Cal.App.3d 144, 149; *People* v. *Mangiefico, supra,* 25 Cal.App.3d 1041, 1046-1047; cf. *Dyas* v. *Superior Court, supra,* 11 Cal.3d 628, 633) are supported by substantial evidence. (See *People* v. *North, supra,* 29 Cal.3d 509, 513.) Clearly they are.

The trial court's determination that in stopping defendant and his brother and searching the rented Caprice the private investigators were not acting as agents of the police or in concert with the police is also amply supported by substantial evidence. The stop and search had both occurred and were completed before the Maywood police arrived on the scene. While the West Covina police were aware the private investigators had been hired by Mr. DeCastro to investigate the disappearance of his sons and knew the investigators were looking for defendant and his brother, they had no knowledge of the investigators' plan to intercept and interrogate defendant and his brother outside defendant's residence or of their plan, apparently concocted on the spur of the moment, to intercept and stop the Plymouth Duster and the Chevrolet Caprice on the public streets nor of the private investigators' intention of searching the automobiles. On these facts the trial court cor-

rectly concluded there was no police involvement sufficient to invoke the application of the exclusionary rule. (Cf. *People* v. *North, supra,* 29 Cal.3d 509, 515-516.)

■ Relying on *People* v. *Zelinski* defendant appears to contend that private investigators fall within the classification "private security forces" as used in *Zelinski* (see also *Stapleton* v. *Superior Court, supra,* 70 Cal.2d 97, 100-101, fn. 3) and that therefore any search or seizure conducted by a private investigator should be subject to the constitutional proscriptions against unreasonable searches and seizures and the derivative exclusionary rule. We do not agree.

Not only were the private investigators involved in this case not performing a law enforcement function or serving a public interest, but private investigators generally do not in the course of their employment make arrests or police-like searches and seizures or act to further the public interest as opposed to the private interest of the person or entity by whom they were employed. In holding the exclusionary rule applicable in the *Zelinski* case a part of the court's rationale was that "the application of the exclusionary rule can be expected to have a deterrent effect on such unlawful search and seizure practices since private *security personnel,* unlike ordinary private citizens, *may regularly perform such quasi-law enforcement activities in the course of their employment.* [Citation.]" (*People* v. *Zelinski, supra,* 24 Cal.3d 357, 366, italics added.) Private investigators generally do not.

While private investigators are licensed by the state (see Bus. & Prof. Code, § 7520 et seq.), a private investigator is statutorily forbidden to use a badge in connection with his business activity (former Bus. & Prof. Code, § 7538, subd. (d); now see Bus. & Prof. Code, § 7539, subd. (d)) and is further forbidden to "use a title, or wear a uniform, or use an insignia, or use an identification card, or make any statement with the intent to give an impression that he is connected in any way with the federal government, a state government, or any political subdivision of a state government" (former Bus. & Prof. Code, § 7538, subd. (e); now see Bus. & Prof. Code, § 7539, subd. (e)). Although several of the private investigators involved in this case were retired policemen, their testimony was that they did not display to defendant nor his brother any badge or other identification indicating they were policemen, but, rather, showed them identification cards indicating they were private investigators. Moreover, the record makes absolutely clear that defendant did not believe the private investigators were policemen; he believed they were "hit men" sent from Miami to kill him.

We agree with the statement of the court in *People* v. *Mangiefico, supra,* 25 Cal.App.3d 1041, 1046: "We are persuaded that it cannot be concluded

that *all* private investigators are engaged in procuring evidence so as to facilitate the enforcement of the law. It is a matter of common knowledge that many investigators do not have as their primary mission the enforcement of the law or the procuring of evidence in aid of criminal prosecutions. [Citation.]'' (Original italics.)

### 2. *Evidence Developed During Trip to West Covina*

█ We agree with the trial court's assessment that the Maywood police were remiss in permitting the private investigators to transport defendant against his will from the place at which they had detained him to the West Covina Police Department. Moreover, the investigators' doing that was at the suggestion of the West Covina police. On either or both bases the trial court acted with propriety in suppressing any statements made by the defendant or other evidence adverse to the defendant developed during that journey.

### 3. *Defendant's Statements and Actions at the West Covina Police Department and Subsequent Ballistics Tests*

Defendant's express argument is that the evidence of his statements and actions at the West Covina Police Department and the subsequent ballistics tests should be suppressed because they resulted from the initial detention and search of his rented vehicle, which defendant asserts were constitutionally impermissible. We have affirmed, however, the trial court's determination that the detention and vehicle search were not constitutionally impermissible because they were carried out by the private investigators acting as private persons serving private interests. There is no necessity therefore of our addressing defendant's contention based on the unconstitutionality of the detention and vehicle search. █ In what may be an excess of caution, however, we shall address the question of whether the illegality involved in the private investigators' being permitted by the Maywood police to transport defendant to the West Covina Police Department somehow tainted the evidence of his statements and actions in the discussions that took place there. We conclude it did not.

The trial court's determination that defendant's waiver of his *Miranda* rights and his discussions with Detective Heieck and later with Mr. DeCastro and Nicado were free and voluntary is overwhelmingly supported by the evidence. It is very clear from the record that defendant believed the private investigators were "hit men" sent from Miami to kill him. He resisted getting into Gonda's vehicle and was yelling at the police for help and yelling to his brother not to go with the investigators because they were "hit men" from Miami. According to defendant, on the way to the West

Covina police station, the investigators took him to a dark, secluded area, took him out of the car and threatened to kill him unless he told them what happened to the DeCastro brothers. Undoubtedly, just as Detective Heieck testified, when defendant actually arrived at the West Covina Police Department he was relieved and happy to be there. He was advised that he was not under arrest, and ultimately he did leave without hindrance. Not only did he agree to discuss the matter, he stated he wanted to discuss the matter and get it cleared up. Within a few minutes after arriving at the station his manner became jovial.

If defendant's discussions with Detective Heieck and Messrs. Castro and Nicado at the West Covina police station can be said to be the fruit of the illegality involved in the police allowing the private investigators to transport defendant to West Covina, the taint of any such illegality was clearly dissipated by defendant's free and voluntary consent to engage in the discussions, his free and voluntary waiver of his *Miranda* rights and his expressed desire to discuss the matter and get it cleared up. ■ As stated by the court in *Mann* v. *Superior Court* (1970) 3 Cal.3d 1, 8 [88 Cal.Rptr. 380, 472 P.2d 468]: "Not 'all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police.' (*Wong Sun* v. *United States, supra,* 371 U.S. 471, 488 [9 L.Ed.2d 441, 455].) Rather, the appropriate test is ' "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." ' (*Wong Sun* v. *United States, supra,* 371 U.S. at p. 488 [9 L.Ed.2d at p. 455]; *People* v. *Johnson* (1969) 70 Cal.2d 541, 546 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366]; *People* v. *Sesslin* (1968) 68 Cal.2d 418, 428 [67 Cal.Rptr. 409, 439 P.2d 321].)

"*The defendant's consent may constitute such a sufficiently distinguishable means if it is not induced by compulsion, intimidation, oppressive circumstances, or other similar factors* inherent in the situation which make that consent less than an act of free will. (Cf. *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 766-768 [44 Cal.Rptr. 313, 401 P.2d 921].)" (Italics added, accord *People* v. *Pranke* (1970) 12 Cal.App.3d 935, 946 [91 Cal.Rptr. 129]; see also *People* v. *Sesslin* (1968) 68 Cal.2d 418, 428 [67 Cal.Rptr. 409, 439 P.2d 321].)

The court therefore acted with propriety in declining to suppress the evidence of defendant's actions and statements at the West Covina police station and the subsequent ballistics tests.

## *Disposition*

No error is demonstrated. The judgment is affirmed.

McDaniel, J., and Rickles, J., concurred.

On October 2, 1985, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied December 19, 1985.