542 P.2d 170 (1975)
In the Matter of J.M.A., a child, Appellant,
v.
STATE of Alaska, Appellee.
No. 2391.
Supreme Court of Alaska.
November 5, 1975.
*171 Douglas A. Fox, Asst. Public Defender, Herbert D. Soll, Public Defender, Anchorage, for appellant.
James L. Hanley, Asst. Atty. Gen., Avrum M. Gross, Atty. Gen., Juneau, Joseph D. Balfe, Dist. Atty., Anchorage, for appellee.
Before RABINOWITZ, Chief Justice, and CONNOR, ERWIN, and BOOCHEVER, Justices.

OPINION
BOOCHEVER, Justice.
On this appeal, we are presented with the novel question of whether foster parents are to be considered agents of the *172 state for purposes of the constitutional proscription against unreasonable searches and seizures. Appellant J.M.A. also raises issues concerning the constitutional guarantee against self-incrimination involved in a failure to give a Miranda warning before interrogation, and the constitutional guarantee of due process of law, as applied to the judge's review of J.M.A.'s juvenile record prior to the adjudication of his case.
In May 1974, appellant J.M.A. was placed in the home of Mr. and Mrs. Blankenship as a foster child. The Blankenships were licensed by the State of Alaska to operate a foster home for as many as five children. For their efforts in this regard, they received a monthly allowance from the state of $233.00 for each child so housed.
In early August 1974, Mrs. Blankenship became concerned with the fact that children who were strangers to her were coming into her home, staying briefly and departing. She suspected that these visits were related to trafficking in drugs. As a result of these suspicions, Mrs. Blankenship began periodically searching J.M.A.'s room during the first week of August. On August 8, 1974, Mrs. Blankenship listened on another extension to one of J.M.A.'s telephone calls without his knowledge or permission. During the course of this conversation, she heard J.M.A. tell the other party he had only a little pot left and needed to pick up some more plus some pills. Mrs. Blankenship again searched J.M.A.'s room and discovered no drugs, although earlier that day she had found and confiscated a pipe. During the evening of August 8, Mrs. Blankenship returned to J.M.A.'s room and searched a jacket she saw lying on the bed. Discovering a plastic bag of marijuana in one of the pockets, she removed the bag and placed it in her purse. No mention of the discovery was made to J.M.A. that day.
The next day Mrs. Blankenship called Jerry Shriner, the social worker assigned to J.M.A., seeking advice on how to deal with the problem. Mr. Shriner advised Mrs. Blankenship to place the marijuana in an envelope for safekeeping and assured her that he would visit her home in the afternoon. Mr. Shriner then called the Alaska State Troopers, and later on the same day, Mr. Shriner and a plainclothesman went to the Blankenship residence. J.M.A., who had been asked to stay home, was called into the living room where he was confronted by Mr. Shriner, Officer Fullerton and Mrs. Blankenship. Mrs. Blankenship then handed the marijuana to Officer Fullerton, who identified it as such and began questioning J.M.A. about it. The officer asked J.M.A. whether the jacket in which the marijuana was found was his jacket. J.M.A. admitted that the jacket was his but denied any knowledge of the marijuana. During the course of the meeting, J.M.A. was never advised of his rights.[1]
*173 J.M.A. was removed from the Blankenship home by Mr. Shriner and Officer Fullerton immediately after this meeting and placed in detention pending consideration of his case by the juvenile court. Counsel for J.M.A. filed a motion to suppress all evidence obtained as a result of the overheard telephone conversation and the searches of J.M.A.'s room. On October 8, 1974, a hearing on the motion to suppress was held, and on October 29, 1974, Judge Occhipinti issued his decision denying J.M.A.'s motion to suppress the evidence gathered against him. The adjudication hearing was held on October 31, 1974, resulting in a finding of delinquency.[2] The superior court ordered that J.M.A. be committed to the Department of Health and Social Services for an indeterminate period not to extend beyond his nineteenth birthday, and that he be placed in a correctional or detention facility.
J.M.A. now appeals both from the ruling on the motion to suppress and from the adjudication of delinquency. J.M.A. alleges that the trial court erred in failing to suppress evidence obtained by the foster mother's eavesdropping on J.M.A.'s phone call; in failing to suppress evidence obtained through her searches of J.M.A.'s room; in failing to suppress statements made by J.M.A. in response to police questioning conducted without being prefaced by the Miranda warnings; and in considering J.M.A.'s entire juvenile record during the adjudication phase of the delinquency proceedings.
With regard to J.M.A.'s allegation that the lower court erred in failing to suppress the evidence obtained by Mrs. Blankenship through her eavesdropping on J.M.A.'s telephone conversation[3] and her searches of his room, we must determine whether the state and federal constitutional prohibitions[4] against unreasonable searches and seizures apply to a foster parent, licensed and paid by the state, and if so, whether the exclusionary rule, whereby evidence obtained in violation of the constitution is held inadmissible, should apply. Our analysis must initially focus on the question of whether the foster parent stands in such a relationship to the state as to be subject to the constitutional prohibitions against unreasonable searches and seizures. J.M.A. contends that the evidence gathered by Mrs. Blankenship should be suppressed since these warrantless searches were executed while Mrs. Blankenship was acting as an agent of the state, and thus did not comport with constitutional requirements concerning such actions. The state, to the contrary, argues that Mrs. Blankenship, as a foster parent, is not an agent of the state for purposes of the fourth amendment.
Although the constitutional prohibitions against unreasonable searches and seizures have not been specifically limited to state action, there is little doubt but that *174 that was the original intent.[5] We stated in Bell v. State:[6]
A search by a private citizen not acting in conjunction with or at the direction of the police does not violate the constitutional prohibitions against unreasonable search and seizure.
There is a further limitation on the scope of the fourth amendment in that it does not apply to searches engaged in by governmental officials when such officials act for a private purpose or outside the scope of duties related to law enforcement. Such a limitation involves a question of the capacity in which the state agent acts during the course of the search. In Bell, this court held an airport security officer to be subject to the same fourth amendment standards as a law enforcement officer, reasoning:
The controlling principle does not depend so much upon which department of state government employs the officer, but instead upon the nature of the duties performed and the part the officer may have played in the course of events leading to appellant's arrest and the seizure which followed. His duties were to provide crash and rescue services and to assure physical security in the airport and parking areas. He carried a sidearm.[7]
Considering the question of when official involvement may be said to exist for purposes of the fourth amendment, the Oregon Court of Appeals in State v. Pearson, 15 Or. App. 1, 514 P.2d 884, 886 (1973), stated:
... [O]fficial involvement is not measured by the primary occupation of the actor, but by the capacity in which he acts at the time in question.[8]
Similarly, in People v. Wolder,[9] 4 Cal. App.3d 984, 84 Cal. Rptr. 788 (1970), the action of an off-duty police officer in searching his daughter's apartment was found not subject to the fourth amendment, since, at the time, the police officer was acting in a private capacity as a concerned parent.
Applying these principles to the instant case, it is apparent that, in some respects, Mrs. Blankenship is an agent of the state. Her home is licensed and regulated by the state,[10] and she is paid by the state for caring for foster children. But she also acts in a private capacity in managing the home for her family and herself. In all likelihood, her search of J.M.A.'s room and her listening to his telephone conversation involved both her state duties and her private functions. In both capacities, she had a need to supervise the young people placed under her control, and, solely as a private person, she had a legitimate concern about the illegal activities taking place in her home.
The mere fact that Mrs. Blankenship may have been acting in part as an agent of the state, however, does not necessarily mean that fourth amendment prohibitions apply. As we indicated in Bell, the real question is whether the nature of one's duties is related to law enforcement. In that regard, the activities of even a private citizen, acting on behalf of the police, *175 would be subject to the prohibitions of the fourth amendment.[11]
A foster parent is required both to assume temporarily the role of a natural parent to the child committed to his custody and to aid in the discharge of the government's obligation to care for and supervise those juveniles who have become the responsibility of the state. In substituting for a natural parent, the foster parent is no more an agent of the police than would be any natural parent. The actions of Mrs. Blankenship were in no manner instigated by the police. She testified that she did not want her children to get into trouble with the police and that she sought to work out such problems without police involvement. In fact, even after discovering the marijuana, she contacted J.M.A.'s social worker rather than the police. There is no reason for regarding Mrs. Blankenship's actions undertaken while fulfilling this parental role, which did not involve collaboration with the police, as being any different from the actions of a private parent, and, therefore, not subject to fourth amendment constitutional restraints.[12]
The second function undertaken by foster parents, that of caring for and supervising foster children on behalf of the state, quite obviously involves the foster parent in a relationship with the state which may be characterized as an agency relationship. At least insofar as the supervision of J.M.A. is concerned, even as an agent of the state, we suggest without deciding that Mrs. Blankenship had the right to search J.M.A.'s room. He had previously been declared a delinquent and was placed in the Blankenship home as an alternative to placement in a correctional institution. Had he been placed in a correctional institution, his room would have been legally subject to searches. "In prison, official surveillance has traditionally been the order of the day."[13]
Thus, if Mrs. Blankenship's relationship with J.M.A. is analogized to that of parent and child, the search did not violate the fourth amendment, and if the relationship were to be construed as similar to that involved had J.M.A. been placed in a correctional institution, again there would be no violation. In this instance, the operator of a foster home is in the extremely difficult position of endeavoring to fulfill the role of parent, and, at the same time, perform the task of supervising the activities of a minor found to be a delinquent. Under the circumstances of such a relationship, a search of the room can hardly be regarded as the type of unreasonable activity constitutionally *176 prohibited. Nevertheless, we believe that the privacy of both natural and foster children should be respected to the fullest extent consistent with parental responsibilities.
Quite obviously, the duties of foster parents do not encompass responsibilities of a law enforcement officer similar to those discussed in Bell.[14] Foster parents are not charged with the enforcement of penal statutes or regulations, nor are they entrusted with ensuring the physical security of the public. They are no more responsible for the detection of criminal activity or the apprehension of those participating in such activity than would be any other private citizen. They merely supervise on behalf of the state those children committed to their care. Such responsibilities are not of the same nature as those discussed in Bell, and, accordingly, we hold that foster parents are not agents of the state for purposes of the fourth amendment.
Our conclusion that the trial court did not err in denying the motion to suppress is bolstered by application of the policies underlying the exclusionary rule to the facts of this case. The rule was first enunciated by the United States Supreme Court in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), which held that evidence acquired by federal officers in violation of the fourth amendment must be excluded. Eventually, the rule was applied to criminal actions in state courts by Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The United States Supreme Court has described the rule as one
calculated to prevent, not to repair. Its purpose is to deter  to compel respect for the constitutional guaranty in the only effectively available way  by removing the incentive to disregard it.[15]
As explained by the California Supreme Court in Dyas v. Superior Court, 114 Cal. Rptr. at 117, 522 P.2d at 677:
The two-fold purpose of the exclusionary rule is to deter law enforcement officers from engaging in unconstitutional searches and seizures by removing their incentive to do so, and to relieve the courts from being compelled to participate in such illegal conduct.
Thus,
[W]hether the exclusionary rule should be invoked depends instead on whether to do so would deter the particular governmental employee, and others similarly situated, from engaging in illegal searches of private citizens.[16]
Thus the purpose of the rule is not to give shelter to those who have violated *177 criminal laws but to insure that the constitutional rights of all citizens will be maintained. Police, knowing that illegally-obtained evidence cannot be used, are encouraged to comply with constitutional provisions. In the instant case, a principal motivating factor of Mrs. Blankenship's actions must have been a desire to aid her foster child as well as to have her home free of illegal drugs and criminal activity. Excluding the evidence seized herein would do nothing to deter similar future conduct by the Blankenships and other foster parents as that interest is entirely separate from a desire to have a person convicted of a crime or adjudged a delinquent. Put another way, the incentive to make a search under the circumstances here involved would not be lessened because of the likelihood that the evidence would be suppressed. In short, the primary purpose to be served by the exclusionary rule would not be served by its application in this case or ones similar to it.[17]
Appellant J.M.A. suggests in passing that AS 11.60.280(b) which prohibits unauthorized eavesdropping on telephone conversations might also provide an alternative basis for barring the admission of Mrs. Blankenship's testimony concerning J.M.A.'s telephone call. In Roberts v. State, 453 P.2d 898 (Alaska 1969), cert. denied, 396 U.S. 1022, 90 S.Ct. 594, 24 L.Ed.2d 515 (1970), reh. denied, 397 U.S. 1059, 90 S.Ct. 1368, 25 L.Ed.2d 681 (1970), we noted that no provision excluding testimony obtained by eavesdropping had been enacted in conjunction with AS 11.60.280(b). In determining whether Mrs. Robert's conduct should come under a court fashioned exclusionary rule, we emphasized that her interception of a telephone conversation was not in any manner initiated or solicited by the police. Mrs. Roberts was acting as a private citizen in good faith and on her own initiative.[18] Similarly, in this case, Mrs. Blankenship acted independently of the police as a private citizen, and no purpose would be served by ruling her testimony of the conversation to be inadmissible under the circumstances here involved.
In summary, in view of our holding that foster parents are not agents of the state for purposes of the fourth amendment, we conclude that the evidence secured by Mrs. Blankenship's efforts, both the testimony regarding the telephone conversation and the marijuana, was properly admitted.
J.M.A. also urges that the trial court erred in refusing to suppress statements made by him in response to questioning by Officer Fullerton since he was not advised of his constitutional rights prior to the questioning. The state does not contest J.M.A.'s right to this advice, but rather contends that there was no custodial interrogation in the instant case and, therefore, Miranda was not applicable.[19] Alternatively, the state argues that even if a Miranda warning should have been given in the instant case, failure to give it and the admission of the statements obtained in its absence were harmless errors since the judge disregarded the statements, relying on other evidence to reach his conclusion.
We hold that the questioning of J.M.A. was clearly custodial. J.M.A. was told by his foster mother that he was to remain home on the day of the questioning. The contraband which Mrs. Blankenship stated she seized from J.M.A.'s jacket was turned over to Officer Fullerton and identified as marijuana by the officer in J.M.A.'s presence. Following this exchange, Officer Fullerton began questioning J.M.A. about the marijuana. During the entire course of the questioning by Officer Fullerton, *178 J.M.A. was confronted by three adults  his foster mother, the social worker assigned to him and a police officer. J.M.A. was not free to leave the scene of the questioning at any time and, in fact, when he did leave, he was in the custody of Officer Fullerton.[20]
While we thus cannot agree with the state's contention that the questioning of J.M.A was not custodial, we nevertheless find harmless any error involved in the alleged admission into evidence of the statements elicited from J.M.A. in the absence of a Miranda warning. J.M.A.'s responses to the questions asked by Officer Fullerton consisted solely of an admission that the jacket in which the marijuana was found was his jacket and a denial of any knowledge of the marijuana. The trial judge stated initially that he would not consider the statements made by J.M.A. The judge later concluded that he would consider the statements "for the record only" as he felt that they were immaterial to the court's consideration. Disregarding J.M.A.'s admission that the jacket belonged to him, the judge had ample uncontradicted evidence before him to the same effect. At the delinquency hearing, it was stipulated by counsel in the case that, Mrs. Blankenship would testify that the jacket in which the marijuana was found was the jacket which J.M.A. had brought with him when he came to live at the Blankenships, that it was the jacket which J.M.A. customarily wore and had worn on the day in question, and the jacket was on J.M.A.'s bed when she searched it. There was no contrary evidence and no testimony from which a rational inference could be drawn that the jacket did not belong to J.M.A. Even if we were to consider that the judge had admitted the statements into evidence and thus had committed error, it is clear beyond a reasonable doubt that it did not prejudice J.M.A., and, we hold therefore, any such error was harmless.[21]
The final allegation of error by J.M.A. on this appeal pertains to the family court's review of J.M.A.'s juvenile record prior to the delinquency hearing. J.M.A. asserts that such a pre-adjudication review of his juvenile record by the family court judge had the effect of denying him his constitutional right to due process of law.[22] To the contrary, the state contends that the judge was required to review J.M.A.'s record prior to the delinquency adjudication since he was twice requested to decide whether detention of J.M.A. should be continued. Alternatively, the state contends that any consideration of J.M.A.'s record by the family court, if it was error, was harmless since there was sufficient evidence to prove the delinquent act herein charged beyond a reasonable doubt, and no indication that the judgment of the juvenile court was influenced by J.M.A.'s prior history.
*179 We approach this allegation of error in the same manner as we would approach a similar allegation in a criminal proceeding for we are of the opinion that juveniles are entitled to the same due process protection in this regard as are adults.[23] It has long been settled that, in criminal cases, an adult offender's prior criminal record may not be the basis upon which his conviction rests.[24] Similar considerations must apply in the case of juvenile records and delinquency adjudications, tempered, as they must be, by the differences in the nature of the proceedings. Often in the operation of the juvenile court system only one judge deals with juvenile affairs, and thus he cannot avoid knowledge of prior transgressions by the minor. This is one factor which militates against strict adherence to the procedures and rules followed in criminal cases. While cognizant of the practical limitations of the juvenile court system, we wish to emphasize here that as in adult criminal proceedings, information of prior offenses or wrongdoing not introduced into evidence at the adjudication proceeding must be conscientiously disregarded. In the instant case, Judge Occhipinti indicated that he was not relying on any material in J.M.A.'s juvenile record in adjudicating J.M.A. a delinquent.[25]
The record was reviewed prior to the adjudication of delinquency for the purpose of determining the proper interim detention of the child. The situation is analogous to making a decision as to bail for an adult offender. The trial court can consider danger to the community as a factor in assessing the amount of bail or fixing the items of a conditional release.[26] Such a consideration necessitates a review of prior convictions. We are of the opinion that similar reference to the juvenile's record under such circumstances is both proper and necessary but that if it is so used, it must be disregarded by the judge in deciding the question of delinquency. We are satisfied that Judge Occhipinti properly disregarded the material contained in J.M.A.'s record in adjudging the latter a delinquent. No prejudice therefore befell J.M.A. as a result of Judge Occhipinti's familiarity with the juvenile record.
Affirmed.
BURKE, J., not participating.
NOTES
[1] In Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706-07 (1966), the United States Supreme Court held:

... [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. (emphasis omitted)
There is no question but that juveniles are also entitled to the warnings required by Miranda. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); United States v. Ramsey, 367 F. Supp. 1307 (W.D.Mo. 1973); In re P., 7 Cal.3d 801, 103 Cal. Rptr. 425, 500 P.2d 1 (1972); Forest v. State, 76 Wash.2d 84, 455 P.2d 368 (1969). See Doe v. State, 487 P.2d 47 (Alaska 1971); R.L.R. v. State, 487 P.2d 27 (Alaska 1971). But cf. State ex rel. Juv. Dept. v. Damrill, 14 Or. App. 481, 513 P.2d 1210 (1973).
[2] The evidence introduced at the delinquency adjudication consisted of the testimony given at the suppression hearing and several stipulations by counsel for the parties. There was no formal hearing separate from the suppression hearing.
[3] Government activity in eavesdropping on a telephone conversation constitutes a search and seizure within the meaning of the fourth amendment. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Thus, our analysis of the issues pertaining to the eavesdropping and the search of the room involve identical considerations.
[4] The fourth amendment of the United States Constitution provides in part:

The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated... .
The parallel Alaska provision appears at art. I, § 14 of the Alaska Constitution. For the purposes of this opinion, unless otherwise indicated, use of the term "fourth amendment" shall encompass the parallel Alaska constitutional prohibition.
[5] See Comment, Seizures by Private Parties: Exclusion in Criminal Cases, 19 Stan.L.Rev. 608 at 608-09 (1967).
[6] 519 P.2d 804, 807 (Alaska 1974) (footnote omitted). See also Burdeau v. McDowell, 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048, 1051 (1921); Comment, Seizures by Private Parties: Exclusion in Criminal Cases, 19 Stan.L.Rev. 608 (1967).
[7] 519 P.2d at 807-08.
[8] There the court admitted contraband seized by a city police reserve officer from a car left at a garage where he was then working as a serviceman. See also Tarnef v. State, 512 P.2d 923, 934 (Alaska 1973), as pertains to the giving of Miranda warnings.
[9] See also Shelton v. State, 479 S.W.2d 817 (Tenn.Cr.App. 1972), cert. denied, 409 U.S. 852, 93 S.Ct. 65, 34 L.Ed.2d 95 (1972).
[10] See AS 47.35.010-.080.
[11] People v. Tarantino, 45 Cal.2d 590, 290 P.2d 505 (1955); People v. Fierro, 236 Cal. App.2d 344, 46 Cal. Rptr. 132 (1965); State v. Scrotsky, 39 N.J. 410, 189 A.2d 23 (1963); Moody v. United States, 163 A.2d 337 (D.C.Mun.App. 1960).
[12] See note 6, supra.
[13] United States v. Hitchcock, 467 F.2d 1107, 1108 (9th Cir.1972), cert. denied, 410 U.S. 916, 93 S.Ct. 973, 35 L.Ed.2d 279 (1973), quoting from Lanza v. New York, 370 U.S. 139, 148, 82 S.Ct. 1218, 1224, 8 L.Ed.2d 384, 388 (1962). We do not imply that eavesdropping on telephone conversations of prisoners is constitutional. In Lanza, the transcript of an electronically intercepted conversation with defendant's incarcerated brother was admitted into evidence. Four members of the majority of the court, however, believed that the ultimate constitutional claim was not raised by the record. Justices Brennan, Douglas and Warren disagreed with the plurality's dicta concerning the fourth amendment question. Their concurrence, which affirmed the judgment solely because the New York decision rested on an independent state ground, asserted:

The tenor of the Court's wholly unnecessary comments is sufficiently ominous to justify the strongest emphasis that of the abbreviated Court of seven who participate in the decision, fewer than five will even intimate views that the constitutional protections against invasion of privacy do not operate for the benefit of persons  whether inmates or visitors  inside a jail, or that the petitioner lacks standing to challenge secret electronic interception of his conversations because he has not a sufficient possessory interest in the premises, or that the Fourth Amendment cannot be applied to protect against testimonial compulsion imposed solely as a result of an unconstitutional search.
[14] The California Supreme Court in Dyas v. Superior Court, 11 Cal.3d 628, 114 Cal. Rptr. 114, 522 P.2d 674 (1974), relied on an analysis similar to that contained in Bell in resolving such an issue. The court found that an employee of the Housing Authority of the City of Los Angeles was restricted by the constitution in his efforts to obtain evidence of criminal activity.

One of Klepper's duties was evidently to deliver "legal papers" to the housing project, the task which brought him there on the evening of his confrontation with defendant. But other undisputed testimony compels us to believe he was far more than a mere process server. As we have seen, he was fully uniformed, armed, and equipped as a law enforcement officer. Considering his proficiency in searching and arresting defendant, it is apparent he had also been specially trained to act in that capacity. In these circumstances we may fairly infer that another of the duties for which Klepper had been hired by the Los Angeles Housing Authority was to enforce penal statutes and regulations on or about housing authority property, and that he was in the course of discharging that duty when he searched defendant without warrant or probable cause. 114 Cal. Rptr. at 119, 522 P.2d at 679.
[15] Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669, 1677 (1960). See Michigan v. Tucker, 417 U.S. 433, 446-47, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182, 194-95 (1974); United States v. Peltier, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975); but see Justice Brennan's dissenting opinion in the Peltier case, supra.
[16] Id., 114 Cal. Rptr. at 119, 522 P.2d at 679.
[17] See United States v. Peltier, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). and discussion of "the imperative of judicial integrity" contained therein and in the dissent of Justice Brennan. See also Alaska Rule of Criminal Procedure 26(g) which specifies "Evidence illegally obtained shall not be used for any purpose including the impeachment of a witness".
[18] 453 P.2d at 902.
[19] See note 1, supra; 31 A.L.R.3d 565 (1970).
[20] The state cites State v. Travis, 250 Or. 213, 441 P.2d 597 (1968), in support of its position. In Travis, however, the court emphasized the fact that the defendant was not arrested until substantially after questioning by the police in concluding that the questioning was not custodial. In the instant case, J.M.A. did not "... [leave] the scene of the interrogation as a free man". 441 P.2d at 599.
[21] The standard of review as to whether a federal constitutional error is harmless is that "the court must be able to declare a belief that it was harmless beyond a reasonable doubt". Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 711 (1967); Burford v. State, 515 P.2d 382, 383 (Alaska 1973); R.L.R. v. State, 487 P.2d 27, 42 (Alaska 1971); Love v. State, 457 P.2d 622, 631 (Alaska 1969).
[22] The fourteenth amendment of the United States Constitution provides in part:

... [N]or shall any State deprive any person of life, liberty, or property, without due process of law... .
Similarly, art. I, § 7 of Alaska's Constitution states in part:
No person shall be deprived of life, liberty, or property, without due process of law.
Due process must be afforded to juveniles in delinquency proceedings. Doe v. State, 487 P.2d 47 (Alaska 1971); R.L.R. v. State, 487 P.2d 27 (Alaska 1971).
[23] See note 21 supra. See also In re Appeal in Pima Cty. Anon., 110 Ariz. 98, 515 P.2d 600 (1973).
[24] As a general rule, evidence of other unrelated criminal activity is inadmissible to show either the defendant's guilt on the particular case or the defendant's predisposition to commit such a crime. Galauska v. State, 527 P.2d 459 (Alaska 1974); United States v. Webb, 466 F.2d 1352 (9th Cir.1972); DeVore v. United States, 368 F.2d 396 (9th Cir.1966); Lurding v. United States, 179 F.2d 419 (6th Cir.1950).
[25] Summarizing the evidence which he intended to consider for purposes of the adjudication, Judge Occhipinti stated:

Now, as I understand it, I will consider only the fact that Mrs. Blankenship, who is the foster mother at the home where the minor was staying, because of suspicious circumstances, listened into a telephone conversation and  which alerted her to the possibility of marijuana in the house in the possession of the minor, she searched his room and later on testified that  I don't know if her husband was involved somehow, but they found his jacket, which he said was his jacket, and searched the jacket and found marijuana. And on the basis of that testimony the court would find the minor then a delinquent again, based on this petition with  reserving the objections that counsel has made on behalf of the minor concerning the suppression items and the testimony of Mrs. Blankenship.
. . . . .
The other facts I am not considering are some admissions  or at least some testimony made by the minor whom I  I can't recall now, but I'm sure if I looked in the file it would refresh my memory, but I'm not doing so because I don't  I'm not going to consider it.
. . . . .
And also the additional fact that I will consider as a fact that there  the substance was, in fact, marijuana.
[26] Martin v. State, 517 P.2d 1389, 1397 (Alaska 1974); AS 12.30.020; Doe v. State, 487 P.2d 47, 53 (Alaska 1971); In re G.M.B., 483 P.2d 1006, 1010 (Alaska 1971).