646 P.2d 252 (1982)
D.R.C., Appellant,
v.
STATE of Alaska, Appellee.
No. 4905.
Court of Appeals of Alaska.
June 11, 1982.
*253 Peter F. Mysing, Asst. Public Defender, Kenai, and Brian Shortell, Public Defender, Anchorage, for appellant.
Gayle A. Horetski, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.
Before BRYNER, C.J., and COATS and SINGLETON, JJ.

OPINION
SINGLETON, Judge.
D.R.C. appeals from a determination that he is a delinquent minor[1] based upon a jury finding that he had committed petty larceny.[2]
On appeal D.R.C. alleges that evidence which was seized in violation of the state[3] and federal constitutions[4] was introduced against him at the delinquency proceeding. The following facts establish the context in which the search and seizure occurred.
Norman Hiler, Walter Krieger and D.R.C. are students at Kenai Central High School. On February 19, 1979, Hiler and Krieger attended second-period gym classes. Hiler was in a class instructed by Coach Robert Boudreaux; Krieger was in a different teacher's class. The lockers in the boys' locker room were reserved for students who rented them or who participated on a school team. Hiler did not have a locker and therefore, after changing for his weightlifting class, hung his clothes on a hook on the wall. His wallet, which was in the back pocket of his trousers, contained approximately fifty-five dollars  consisting of two twenty-dollar bills and at least three five-dollar bills.
Because the Kenai High School had experienced quite a bit of theft in the locker rooms during gym classes, Coach Boudreaux's policy was to remain in the locker room until all the students had gone into the gym and to keep the locker room locked while classes were in progress. On February 19, Boudreaux waited until his entire *254 class, including Hiler, had gone into the gym; then he locked the door to the outside hall. Boudreaux then inspected the entire area, checking for students, and found no one left in the locker room except Krieger. After asking Krieger, whom he knew, to make sure the gym door was locked before leaving for class, Boudreaux left. About this time, D.R.C., whom Krieger did not know, entered the locker room to use the lavatory. D.R.C. agreed to lock the door when he left and Krieger went to class. Krieger testified that he watched the front door during his class but did not see D.R.C. leave the locker room.
After his class, Hiler returned to the locker room, noticed that his money was missing, and notified Boudreaux who in turn confronted Krieger. Krieger mentioned seeing someone he later identified as D.R.C., but whose name he did not know, and he and Hiler were told by Boudreaux to find and bring D.R.C. to him. The two subsequently confronted D.R.C. in the hall and told him that he was wanted by Boudreaux; D.R.C. demurred and a scuffle ensued between D.R.C. and Hiler. The fight was broken up by two teachers who escorted Hiler and D.R.C. to the office of Gregory Daniels, the assistant principal. Daniels calmed the boys down and learned the reason for the fight from Hiler. Daniels then excused Hiler to another room and Boudreaux entered the office. D.R.C. was questioned about the missing money by Daniels and searched by Boudreaux, Daniels and Clark. Daniels and Boudreaux testified that D.R.C. consented to the search, but D.R.C. denied this assertion. Boudreaux patted down D.R.C., frisked his pockets and had him remove his outer coat which was then searched. Finally Boudreaux asked D.R.C. to remove his shoes. An amount of money similar in denominations to that described by Hiler was found in one of D.R.C.'s shoes. After the money was found the police were called.
Boudreaux and Daniels had conducted searches in the past, though never strip searches. According to Boudreaux, there was a school policy of working "very, very closely with the police in [a case of] theft or drugs," and if stolen goods or illegal drugs were found on a student the police were generally brought in. Daniels, before authorizing the search, knew that D.R.C. was "in the area" when the money was stolen, and was the suspected culprit. He discussed the matter with Boudreaux before they searched D.R.C. Furthermore, the school district's policy manual permitted school officials to search the students for "cause," such as weapons, drugs or stolen money.
Subsequently, a petition of alleged delinquency was filed against D.R.C.D.R.C.'s counsel filed a motion to suppress the money that was recovered during the search. The motion was denied by the trial court, and a jury trial was held. D.R.C. was found guilty of petty larceny. Following his conviction, the court declared D.R.C. a delinquent but placed him on probation on the conditions that he stay in his father's care and serve a temporary detention at the McLaughlin Youth Center.[5] D.R.C. questions the denial of his motion to suppress the money found in his shoe. The sole issue before us is whether items gathered during such a search are admissible in evidence at a delinquancy proceeding.
No Alaska case discusses the applicability of the state and federal constitutional prohibitions against unreasonable searches and seizures to school searches of minor students by school officials. In Cox v. State, 575 P.2d 297, 303 (Alaska 1978), the court indicated in passing that school officials who seized an adult non-student on school grounds might not be governmental agents for purposes of the state and federal constitutions, and indicated that even though there were cases where the fourth amendment applied, the exclusionary rule usually did not. Id. at 303 n. 19.
*255 The cases from other jurisdictions that have addressed this issue, while generally consistent in result, are varied in their rationales. Essentially the cases reflect four different views regarding the application of the fourth amendment and the exclusionary rule to searches of school students on school premises by school employees. The views are as follows: (1) The fourth amendment does not apply because the search is performed in a private rather than a governmental capacity because the school official stands In loco parentis, i.e., in the position of a parent. In re Donaldson, 269 Cal. App.2d 509, 75 Cal. Rptr. 220 (1969); Commonwealth v. Dingfelt, 227 Pa.Super. 380, 323 A.2d 145 (1974); Mercer v. State, 450 S.W.2d 715 (Tex.Civ.App. 1970). (2) The fourth amendment applies but the exclusionary rule does not. United States v. Coles, 302 F. Supp. 99 (N.D.Me. 1969); State v. Young, 234 Ga. 488, 216 S.E.2d 586 (1975); State v. Wingerd, 40 Ohio App.2d 236, 318 N.E.2d 866 (1974) (dictum). (3) The fourth amendment and the exclusionary rule apply, but reasons generally subsumed under the heading in loco parentis lower the standard to be applied in determining the reasonableness of the search from probable cause to reasonable suspicion. In re W., 29 Cal. App.3d 777, 105 Cal. Rptr. 775 (1973); In re C., 26 Cal. App.3d 320, 102 Cal. Rptr. 682 (1972); In re G.C., 121 N.J. Super. 108, 296 A.2d 102 (1972); People v. Singletary, 37 N.Y.2d 310, 372 N.Y.S.2d 68, 333, N.E.2d 369 (1975); People v. D., 34 N.Y.2d 483, 315 N.E.2d 466 (1974); People v. Jackson, 65 Misc.2d 909, 319 N.Y.S.2d 731 (N.Y. App. Term 1971), aff'd, 30 N.Y.2d 734, 333 N.Y.S.2d 167, 284 N.E.2d 153 (N.Y. 1972). (4) The fourth amendment and the exclusionary rule apply as does the requirement of probable cause. State v. Mora, 307 So.2d 317 (La. 1975), vacated, 423 U.S. 809, 96 S.Ct. 20, 46 L.Ed.2d 29 (1975) (case remanded to consider whether judgment was based upon federal or state constitutional grounds, or both), modified, 330 So.2d 900 (La. 1976) (judgment held to have been based on both federal and state constitutional grounds), cert. denied, 429 U.S. 1004, 97 S.Ct. 538, 50 L.Ed.2d 616 (1976). The cases representing each of these views are collected in Shaw, Admissibility, in Criminal Case, of Evidence Obtained by Search Conducted by School Official or Teacher, 49 A.L.R.3d 978 (1973); see also State In Interest Of T.L.O., 428 A.2d 1327, 1332 (N.J. Super. 1980).
The trial court adopted the first position's reasoning in holding that Boudreaux and Daniels were acting as private persons when conducting the search.[6]
We agree with appellant that the phrase in loco parentis, used by Blackstone to describe the relationship between teachers and students when education was predominately private and teachers could reasonably be viewed as the agent of the students' parents, has little utility in describing contemporary compulsory public education. See Ingraham v. Wright, 430 U.S. 651, 662, 97 S.Ct. 1401, 1407, 51 L.Ed.2d 711, 724 (1977). Under Alaska law, education is a state responsibility, see Alaska Const. art. VII, § 1, and school attendance is compulsory by law. AS 14.30.010-14.30.050. Moreover, it appears that the school officials, in claiming the right to search D.R.C., relied upon their status as public school officials, in and acted pursuant to policies adopted by the school board and therefore acted under "color of law." Cf. West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628, 1637 (1942) (fourteenth amendment applies to school boards). Consequently, there is sufficient "state action" to present a constitutional question under the fourth and fourteenth amendments to the United States Constitution and sufficient governmental action to raise questions under article I, sections 14 and 22 of the state constitution. See J.M.A. v. State, 542 P.2d 170, 173-174 (Alaska 1975).
*256 A determination that the fourteenth amendment applies to the actions of Boudreaux and Daniels while necessary to make the fourth amendment applicable is not sufficient for that purpose. In Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 505-09, 89 S.Ct. 733, 735-38, 21 L.Ed.2d 731, 737-39 (1969), the court found the first amendment applicable in reviewing school disciplinary regulations. But cf. Breese v. Smith, 501 P.2d 159 (Alaska 1972) (in view of conflict in the judiciary and lack of consensus among authorities, case involving school hair regulation was decided under the Alaska Constitution, article I, section 1, and article VII, section 1 rather than under U.S. Constitution amendments I, IX or XIV). In Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1972), the court held the eighth amendment inapplicable to school disciplinary action. However, neither Tinker nor Ingraham is dispositive of the applicability of the fourth amendment. Each amendment has a separate history and addresses separate evils. The applicability of the fourth amendment to a student search can only be determined after considering the fourth amendment's history and deciding whether the search and the circumstances in which it was conducted was within the evil which the fourth amendment's drafters sought to prevent. If the fourth amendment governs a search of a student by a federally-employed school teacher, it governs a search by a state-employed school teacher. We conclude that the school officials who searched D.R.C., while they are public employees subject to constitutional constraints,[7] are not "law enforcement officers" whose conduct is governed by state and federal constitutional limitations on searches and seizures.[8] We therefore affirm the trial court. We believe this decision is mandated by Bell v. State, 519 P.2d 804 (Alaska 1974), and J.M.A. v. State, 542 P.2d 170 (Alaska 1975).[9]
*257 In Bell our supreme court held that an airport security guard, employed by the State Department of Public Works, was a "law enforcement officer" whose search of an air-freight shipment was governed by the fourth amendment. In reaching this conclusion the court said:
The airport security officer who investigated the suspicious shipment ... was an agent of the state against whom the prohibitions of the fourth amendment apply, despite the fact that he was an employee of the Department of Public Works, and not the Department of Public Safety. The controlling principle does not depend so much upon which department of state government employs the officer, but instead upon the nature of the duties performed and the part the officer may have played in the course of events leading to appellant's arrest and the seizure which followed. His duties were to provide crash and rescue services and to assure physical security in the airport and parking areas. He carried a sidearm. When the cargo handler opened the shipment, he believed it contained drugs. This is what led him to call the airport security office. The security officer who was dispatched made an investigation. We hold that the security officer is required to meet the same standards imposed upon any other state or local law enforcement officer in performing his duties.
519 P.2d at 807-08 (citations omitted; emphasis added).
The supreme court extended this reasoning in J.M.A. v. State, 542 P.2d 170 (Alaska 1975), where J.M.A. complained that a search made by a foster parent, who was employed by the state to care for him, was illegal. The court recognized that the foster mother, in searching J.M.A.'s room and eavesdropping on a telephone conversation, acted in two capacities: first, as a parent-homeowner concerned with the welfare of the children in her charge and with maintaining her home free of illegal activity; and second, as a state employee analogous to a correctional officer supervising and housing a person on probation. In considering the first capacity, the court reasoned the foster mother was a private citizen clearly free from fourth amendment constraints. In reference to the latter capacity, the court conceded the issue was less clear; nevertheless, the court relied upon Bell, in holding that a state employee who was not regularly engaged in law enforcement was not governed by the fourth amendment:
There is a further limitation on the scope of the fourth amendment in that it does not apply to searches engaged in by governmental officials when such officials act for a private purpose or outside the scope of duties related to law enforcement. Such a limitation involves a question of the capacity in which the state agent acts during the course of the search.
542 P.2d at 174. After carefully evaluating the facts, the court concluded:
Quite obviously, the duties of foster parents do not encompass responsibilities of a law enforcement officer similar to those discussed in Bell. Foster parents are not charged with the enforcement of penal statutes or regulations, nor are they entrusted with ensuring the physical security of the public. They are no more responsible for the detection of criminal activity or the apprehension of those participating in such activity than would be any other private citizen. They merely supervise on behalf of the state those *258 children committed to their care. Such responsibilities are not of the same nature as those discussed in Bell, and, accordingly, we hold that foster parents are not agents of the state for purposes of the fourth amendment.
Id. at 176 (citation omitted).
We believe that the reasoning of J.M.A. is controlling here. School teachers and administrators when engaged with disciplinary matters are not charged with the enforcement of penal statutes or regulations, nor are they entrusted with ensuring the physical safety of the public at large. They are, however, responsible for the safety of a small part of the public  their students  when those students are on school premises during school hours. School officials clearly have no greater responsibility for the detection of crime or the apprehension of criminals than do other citizens except to the extent that school regulations parallel state laws and criminal activity violating such school regulations takes place during school hours on school premises. School officials, like foster parents, merely supervise, on behalf of the community, those children committed to their care.
Like the supreme court in J.M.A., we are bolstered in this decision by our understanding of the purpose served by the exclusionary rule. The enforcement of school regulations, the safeguarding of students during school hours through confiscation of weapons and other contraband, and the maintenance of a drug-free learning environment provide substantial incentives to "search" that would not be lessened by the suppression of evidence at a subsequent delinquency proceeding. Id. at 177.[10]
Further, we believe the supreme court's resolution of J.M.A., which distinguishes between law enforcement officers and other state employees for purposes of the fourth amendment and article I, sections 14 and 22 of the Alaska Constitution, and our reliance on that decision to resolve the instant case is consistent with federal constitutional law. We note that in recent cases the United States Supreme Court has stressed deterrence in deciding whether to apply the exclusionary rule. Cf. United States v. Janis, 428 U.S. 433, 446-60, 96 S.Ct. 3021, 3028-34, 49 L.Ed.2d 1046, 1056-64 (1976), reh'g denied, 429 U.S. 874, 97 S.Ct. 196, 50 L.Ed.2d 158 (1976); United States v. Calandra, 414 U.S. 338, 347-53, 94 S.Ct. 613, 619-22, 38 L.Ed.2d 561, 571-74 (1974).
We recognize that labelling a proceeding "civil" or "criminal" is not determinative of constitutional rights, Marshall v. Barlow's *259 Inc., 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305, 311 (1978); One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 696-703, 85 S.Ct. 1246, 1248-1252, 14 L.Ed.2d 170, 172-76 (1965), and that public officials who are not police officers but who, as an integral part of their duties, undertake searches for the purpose of discovering and preventing violations of law (including administrative regulations punishable by fine or imprisonment) are governed by the fourth amendment. See Marshall v. Barlow's Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (OSHA inspectors); Almeida-Sanchez v. United States, 413 U.S. 266, 270, 93 S.Ct. 2535, 37 L.Ed.2d 596, 601 (1973) (border patrol officials); See v. Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967) (fire inspectors); Camara v. Municipal Court, 387 U.S. 523, 525, 534, 87 S.Ct. 1727, 1728, 1733, 18 L.Ed.2d 930, 933, 938 (1967) (housing inspectors); Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958) (alcohol tax agents); Woods & Rohde, Inc. v. State Dept. of Labor, 565 P.2d 138 (Alaska 1977) (OSHA inspectors); cf. Tarnef v. State, 512 P.2d 923, 934 & n. 22, 935 (Alaska 1973) (private investigator who was working very closely with police as an arson inspector was required to give a Miranda warning before interrogating a suspect). Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), and its progeny are distinguishable from this case. They deal with area-wide exploratory searches by specialized law enforcement officers that are precisely the kind of intrusion the fourth amendment was intended to regulate. See Boyd v. United States, 116 U.S. 616, 624-32, 6 S.Ct. 524, 528-33, 29 L.Ed. 746, 749-51 (1886). Further, as the Camara court noted:
Like most regulatory laws, fire, health, and housing codes are enforced by criminal processes. In some cities, discovery of a violation by the inspector leads to a criminal complaint. Even in cities where discovery of a violation produces only an administrative compliance order, refusal to comply is a criminal offense, and the fact of compliance is verified by a second inspection, again without a warrant. Finally, as this case demonstrates, refusal to permit an inspection is itself a crime, punishable by fine or even by jail sentence.
387 U.S. at 531, 87 S.Ct. at 1732, 29 L.Ed.2d at 936-37 (footnotes omitted).
In contrast to the exploratory searches discussed in the Camara line of cases, school searches are limited as to their time, place, object and purpose. School searches take place while school activities are in progress on school premises or premises being utilized for school activities. Those searched are enrolled minor students, and the purpose of the search is to enforce school discipline. There is nothing in the proceedings leading to the fourth amendment's enactment that suggests that its drafters intended it to apply to institutional searches of members of an institution by those responsible for institutional discipline. See Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution (1937).
Searches of school children on school premises during school hours by school teachers and administrators, while different from area-wide searches for the reasons set out in distinguishing Camara, are analogous to the warrantless searches upheld in United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) and Nathanson v. State, 554 P.2d 456 (Alaska 1976). Attending school is hardly synonymous with operating a pawnshop where guns are sold (Biswell) or fishing for crab (Nathanson), however, a minor school child, like those subjected to search in Biswell and Nathanson, is traditionally subject to close supervision, at least during school hours and while on school premises. It is true that students are required to attend school and thus have not voluntarily subjected themselves to close supervision as have those considered in Biswell and Nathanson. However, the very authority which justifies the state in compelling students to attend school should empower it to subject students to the level of *260 supervision and control necessary to ensure that the goals of the educational system will be fulfilled and that student's health and safety will not be jeopardized during their attendance.
The school employees involved in searching D.R.C. were not hired as security guards or employed to ferret out criminals. Their employment consists of teaching physical education, in Boudreaux's case, and maintaining an environment conducive to learning, in Daniels' case. Their searching D.R.C., like the foster mother's searching J.M.A.'s room, while in the course and scope of their public employment, was merely incidental to that employment and therefore not subject to fourth amendment restrictions.
In conclusion, the fourth amendment, properly viewed in its historical context, applies to two kinds of situations: first, investigations of those suspected of crime by those performing the function of police officers; and second, area-wide exploratory investigations, with or without a suspect, carried out by specialized law enforcement officers in order to prevent crime (including violation of health and safety regulations). Neither situation is involved here.
Finally, we do not believe that article 1, section 22 of the Alaska Constitution dictates a different result. D.R.C. makes two arguments: first, relying on State v. Helfrich, 600 P.2d 816 (Mont. 1979), that the constitutional right to privacy requires suppression of evidence even though seized by a "private person" if seized illegally; and second, that article 1, section 22 should be read to expand the protections against governmental searches and seizures otherwise granted by article 1, section 14. See Wood & Rohde, Inc. v. State Dept. of Labor, 565 P.2d at 148. J.M.A., which was decided long after section 22 was added to our constitution, is dispositive of D.R.C.'s claim that even "private party" searches require suppression[11] and we see no basis for distinguishing between sections 14 and 22 in applying the J.M.A. test to determine whether to suppress the evidence under consideration here.[12]
We believe that authorizing searches of students no more intrusive than the search under discussion here, when they are carried out pursuant to properly enacted school regulations and when they are within the common law privilege to discipline, is consistent with decisions of the Alaska Supreme Court and with article 1, section 22 of the Alaska Constitution. We do not believe that the drafters of the federal Bill of Rights or of our own declaration of rights intended to make the courts referees of minor school disciplinary proceedings, or to subject those proceedings to the application of the uncertain rules developed for use in the criminal courts to vindicate fourth amendment constitutional rights. Thus, neither concerns for "judicial integrity" nor optimism about the deterrent effects of an application of the exclusionary rule warrant suppression of the evidence seized in this case.
Whether or not a teacher's search of a student produces evidence admissible at a later delinquency proceeding, it may unfairly humiliate or frighten the student and, conversely, it may give rise to an expensive and time-consuming law suit against a teacher or school district. Whether or not litigation results, indiscriminate searching *261 may create animosity disruptive of the very educational environment it seeks to preserve. Students, parents, and teachers alike would be well served if school boards, after full public discussion, adopted carefully drawn regulations defining when, where, by whom and under what circumstances searches of students may be conducted. Such regulations would go far in determining the community's view of "reasonable conduct" and would stand the best chance of reconciling the student's legitimate privacy interests with the educational necessities of the school environment.
D.R.C.'s conviction is AFFIRMED. This case is REMANDED to the trial court to correct D.R.C.'s sentence to conform to the requirements of this opinion by removing the condition that he serve a temporary detention at the McLaughlin Youth Center.
NOTES
[1] AS 47.10.010(a)(1) defines a delinquent minor as one who violates a criminal law of the state or a municipality.
[2] Former AS 11.20.140.
[3] Alaska Constitution, art. I, § 14 provides:

Searches and Seizures. The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.
D.R.C. also relies on Alaska Const. art. I, § 22, which provides:
Right of Privacy. The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section.
[4] The fourth amendment of the United States Constitution provides in part:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated... .
This provision has been made applicable to the states by the fourteenth amendment to the United States Constitution. Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961).
Since the fourth amendment and art. I, § 14 of our state constitution are virtually identical reference to the fourth amendment, unless the context suggests the contrary, should be read as a reference to the comparable provision of our constitution as well.
[5] In M.O.W. v. State, 645 P.2d 1229 (Alaska App., 1982) which we decide today, we hold such a condition invalid citing Boyne v. State, 586 P.2d 1250 (Alaska 1978). On remand the trial court shall correct the disposition by removing this condition.
[6] Judge Hanson followed his earlier decision in State v. M.O.W. See M.O.W. v. State, 645 P.2d 1229 (Alaska App., 1982). Judge Hanson also relied on State v. Young, 216 S.E.2d 586 (Ga. 1975), for the proposition that the exclusionary rule does not apply to school teachers.
[7] The first amendment to the United States Constitution, which guarantees freedom of speech, protects students against school actions limiting their speech without compelling educational justification. See Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The "liberty" guaranteed by Alaska Const., art. I, § 1 also limits, to a degree, a school board's power to enact and enforce regulations against its students. See Breese v. Smith, 501 P.2d 159 (Alaska 1972).
[8] But cf. People v. Zelinski, 24 Cal.3d 357, 155 Cal. Rptr. 575, 581, 594 P.2d 1000, 1006 (Cal. 1979) (recognizing that "a person does not need to be an officer of the state to act under color of law and therefore be responsible, along with such officers, for actions prohibited to state officials when such actions are engaged in under color of law.").
[9] Our holding is a narrow one. We find no violation of Alaska Const. art. I, §§ 14 and 22. We express no opinion about more intrusive searches such as strip searches, see, Doe v. Renfrow, 475 F. Supp. 1012, 1017, 1024-25 (N.D.Ind. 1979), modified, 631 F.2d 91 (7th Cir.1980), reh'g denied, 635 F.2d 582 (7th Cir.1980), or random exploratory searches such as those using specially trained dogs to sniff drugs. See Jones v. Latexo Indep. School Dist., 499 F. Supp. 223 (E.D.Tex. 1980). While we consider local official school action "state action," we do not consider the fourth amendment and its Alaska counterpart applicable to school searches carried out during school hours by school teachers and administrative personnel in the absence of police instigation or involvement. See Picha v. Wielgos, 410 F. Supp. 1214, 1220 (N.D.Ill. 1976); cf. McConnell v. State, 595 P.2d 147 (Alaska 1979), cert. denied 444 U.S. 918, 100 S.Ct. 235, 62 L.Ed.2d 173 (1979) (citing Snyder v. State, 585 P.2d 229, 231 (Alaska 1978), for the proposition that, "searches by airline employees, acting for an independent and legitimate airline purpose and not in conjunction with or at the direction of the police, do not violate constitutional prohibitions against unreasonable search and seizure." (footnote omitted)).

Our holding does not apply to searches off school premises, or substantially outside of ordinary school hours, unless made in connection with school activities conducted under school supervision.
Like the trial court, we do not express any opinion about searches by armed, uniformed security guards employed by a school district to maintain security within a school. Compare Bell v. State, 519 P.2d at 807 (a search by a private citizen not acting in conjunction with or at the direction of the police does not violate the constitutional prohibition against unreasonable search and seizure) with People v. Zelinski, 155 Cal. Rptr. at 581, 594 P.2d at 1006 (recognizing that some minimal official participation or encouragement may bring private action within the constitutional constraints on state action).
Finally, the question of procedural due process is not before us either with reference to the enactment of the school rules under consideration here or to their application to D.R.C. Compare Ingraham v. Wright, 430 U.S. at 672-82, 97 S.Ct. at 1413-18, 51 L.Ed.2d at 730-37 (corporal punishment in public schools implicates fourteenth amendment liberty interests, but traditional common law remedies are adequate to afford due process; no prior hearing is necessary) with Goss v. Lopez, 419 U.S. 565, 579-80, 95 S.Ct. 729, 738-39, 42 L.Ed.2d 725, 737-38 (1975) (due process requires that students facing suspension and the consequent interference with a property interest must be given some kind of notice and afforded some kind of hearing).
[10] In State v. Baccino, 282 A.2d 869, 871 (Del. Super. 1971), the court said that the notion that private individuals would not be deterred by an exclusionary rule, while true in the case of isolated private searches, is "inapposite to the situation of a school principal who has a duty to investigate unlawful activity." Cf. People v. Zelinski, 155 Cal. Rptr. at 580, 594 P.2d at 1005 (the application of the exclusionary rule can be expected to have a deterrent effect on private security personnel since they, unlike private citizens, perform quasi-law enforcement activities). We disagree. As Ziff points out in his note, Seizures by Private Parties: Exclusion in Criminal Cases, 19 Stanford Law Review 608, 614 (1967), "[F]or the exclusionary rule to be an effective deterrent, the party committing the search must have foreknowledge of an exclusionary rule plus a substantial interest in seeing that a conviction is obtained." While school officials may search frequently enough to warrant their understanding the applicable rules, they are primarily concerned with maintaining internal discipline rather than obtaining convictions. Id. at 615. Faced with the alternative of tolerating drug use and weapon possession or continuing to search at the risk of jeopardizing "prosecutions," it is likely that the administrators would continue to search. It is only if the fourth amendment precludes basing a disciplinary decision on evidence seized from a student by a teacher, that an exclusionary rule might have a deterrent effect. Cf. Jones v. Latexo Indep. School Dist., 499 F. Supp. at 237-39 (excluding the use of unconstitutionally seized evidence from school disciplinary proceedings will directly and effectively deter unconstitutional conduct of school officials).

As a court whose jurisdiction is limited to criminal appeals, we lack the authority to make any determination governing school disciplinary proceedings as such; we can only determine whether the challenged evidence was admissible in the delinquency proceeding below. In our opinion, a decision excluding evidence in cases such as this would not influence school teachers concerned with maintaining school discipline to forego searches. To the extent that People v. Zelinski, is to the contrary, we decline to follow it.
[11] Boudreaux and Daniels acted pursuant to authority granted by the school board. A school teacher has statutory authority to use "force" on a minor student pursuant to school regulations in carrying out legitimate educational functions. AS 11.81.430(a)(2). Cf. Restatement of Torts 2nd, § 147(2) (civil liability). No decision of the Alaska Supreme Court purports to regulate school searches; consequently, we hold that the evidence taken from D.R.C. was not "illegally obtained" for purposes of applying the exclusionary rule contained in Alaska R.Evid. 412. See Martin v. State, 623 P.2d 1225 (Alaska 1981); cf. former Alaska R.Crim.P. 26(g) (similar to Alaska R.Evid. 412; it provided that illegally obtained evidence could not be used for any purpose).
[12] For the same reason, we would conclude that the need for freedom and flexibility in maintaining school discipline preclude considerations of judicial integrity from dictating a contrary result. See State v. Sears, 553 P.2d 907, 913-14 (Alaska 1976).